UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.    00-6071
                    WJZLOCH

OHMER JACK ANDERSON,

    Plaintiff,

v.

OSAGE SYSTEMS GROUP, INC.,

    Defendant.

MAGISTRATE JUDGE
    SELTZER

_____/

## DEFENDANT'S NOTICE OF REMOVAL OF ACTION
## SIGNED PURSUANT TO FED.R.CIV.P. 11

        COMES NOW, Defendant, Osage Systems Group, Inc. ("Osage"), by and

through undersigned counsel, and files this Notice of Removal signed pursuant to Fed. R.

Civ. P. 11 to remove this action to this Court from the Circuit Court of the Seventeenth

Judicial Circuit in and for Broward County, Florida, and in support thereof, respectfully

show the Court as follows:

        1.        This is a civil action of which this Court has original jurisdiction on the

basis of diversity of citizenship pursuant to Title 28 U. S. C. §1332 (1999) in that this

action has been brought by the Plaintiff, Ohmer Jack Anderson ("Anderson"), who at all

times material, was and currently still is a citizen of Florida1, seeking damages in the

_____

1 On information and belief, Anderson is a citizen of Florida whose principal residence and domicile is
located at 1560 S. E. 14th Court, Deerfield Beach, Florida.  See Section 10.2 of the Purchase Stock
Agreement attached as Exhibit "A" to the Complaint; see also Public Records Search attached hereto as
Composite Exhibit "1."

CASE NO.

amount of Two Million Dollars ($2,000,000.00) against Defendant Osage, a Delaware

Corporation within its principal place of business in Phoenix, Arizona.

    2.    Although Anderson has not plead his citizenship in the Complaint, Exhibit

"A" to the Complaint has provided Defendant Osage with numerous clues as to

Anderson's citizenship.  Specifically, Section 10.2 of the Stock Purchase Agreement

requires that Notice be sent to Anderson at 1560 S. E. 14th Court, Deerfield Beach,

Florida.  Likewise, pursuant to Section 2.1 of the Stock Purchase Agreement and

paragraph 12 of the Complaint, the closing transaction concerning the agreement which is

the subject of this suit was to take place in Broward County, Florida.

    3.    In addition to the foregoing, Anderson also alleges in paragraph 6 of the

Complaint that he was to receive payment under the Stock Purchase Agreement in

Broward County, Florida.

    4.    In light of such clues concerning Plaintiff Anderson's domicile and state of

citizenship, Defendant Osage has been placed on notice that the Complaint may be

subject to removal pursuant to Title 28 U. S. C. §1446(b) (1999).  See e.g. Kaneshiro v.

North American Company for Life & Health Insurance, 496 F. Supp. 452, 460 (D. Hawaii

1980) (determining that when plaintiff's Complaint provides a clue to defendant as to

plaintiff's citizenship, defendant must make an inquiry of the plaintiff for jurisdictional

facts necessary to the petition for removal) and Kuhn v. Brunswick Corp., 871 F. Supp.

2

CASE NO.

1444, 1446 (N. D. Ga. 1994) (finding that when the initial pleading provides a clue as to

the plaintiff citizenship, the burden is on the defendant to file the petition for removal

within 30 days of receipt of the initial pleading); see also Jones Chemicals, Inc. v.

Distribution Architects International, Inc., 786 F. Supp. 310, 314 (W. D. NY. 1992)

(finding that a summons with notice of specific facts enabling a defendant to ascertain

removability with reasonable investigation was sufficient to trigger the 30-day removal

period).

     5.     Acting upon the clues found in Anderson's Complaint and the exhibits

thereto, Osage, after further inquiry and investigation has discovered facts indicating that

Plaintiff Anderson is a domicilary and citizen of Florida, as follows:

     a)     As of 1994, Anderson was issued and currently holds a valid
Florida Driver's License No. A536-650-31-380 which indicates a current Florida
address at 1560 S. E. 14th Court, Deerfield Beach, Florida;

     b)     Anderson currently owns a 1989 Rolls Royce and a 1998 Cadillac
both registered in the State of Florida under Tag No. A16 AFR and Tag No. VGE
80T, respectively.  Both vehicle registrations currently indicate Anderson's
residential address as being 1560 S. E. 14th Court, Deerfield Beach, Florida; and

     c)     A Florida property query indicates that for tax roll years 1993
through 1998, Anderson has maintained a residence in the State of Florida.

See Public Records Search attached hereto and incorporated herein by reference as

composite Exhibit "1".  See also Latin American Energy Development, Inc. v. Vague,

1996 W. L. 312061 (E. D. La. 1996) (stating factors taken into account by the Courts in

3

CASE NO.

evaluating the domicile of a party include, but are not limited to, current residence, voting

registration, location of personal or real property, driver's license, automobile registration,

and payment of taxes).

    6.    The information discovered by Osage coupled with the clues contained in

Anderson's Complaint and Exhibits thereto, indicate that Anderson is a domicilary of the

State of Florida and therefore, a Florida citizen.

    7.    The Court's inquiry concerning whether diversity of jurisdiction exists

under 28 U. S. C. §1332 is not limited to the face of the plaintiff's Complaint, rather the

Court may examine the record as a whole.  See Baker v. Firestone Tire & Rubber Co.,

537 F. Supp. 244, 246 - 47 (S. D. Fla. 1982) (concluding that the Court may look to the

record as a whole including the Petition for Removal in order to determine the propriety

of removal); see also Estevez-Gonzalez v. Kraft, Inc., 606 F. Supp. 127, 128 (S. D. Fla.

1995) (recognizing that the Court may consider the allegations in the Petition for

Removal to determine whether removal is proper when the Complaint contains no

specifications of damages concerning the amount in controversy).

    8.    Here, Anderson, a citizen of Florida has served a Complaint on December

16, 1999 upon Osage, a citizen of both Delaware and Arizona, and therefore, this Notice

is filed within the time frame allowed by 28 U. S. C. §1446(b) (1999).

4

CASE NO.

9.    True and legible copies of all process, pleadings, orders and other papers or exhibits of every kind now on file with the State Court and/or served by and upon Osage are annexed hereto.

10.    In light of the aforementioned, the District Court has diversity of citizenship jurisdiction over this civil action pursuant to 28 U. S. C. §1332 (1999).

11.    Therefore, Osage may remove this civil action pursuant to Title 28 U. S. C. §1446 (1999) to the United States District Court for the Southern Judicial District of Florida, the district in which the State Court action was pending.

12.    This notice has been signed by the undersigned pursuant to Fed.R.Civ.P. 11 (1999).

BY _____
WILLIAM E. DAVIS (trial counsel)
Attorneys for Osage
Florida Bar No. 191680
BUCHANAN INGERSOLL, P.C.
2100 NATIONSBANK TOWER
100 SOUTHEAST SECOND STREET
MIAMI, FL 33131
(305) 347-4080

5

CASE NO.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true copy of the foregoing was mailed this _14_ day of January 2000 to: Jeffrey B. Smith, Kelley, Herman & Smith, Attorneys for Plaintiff, 1401 East Broward Boulevard, Suite 206, Fort Lauderdale, FL 33301.

WILLIAM E. DAVIS

35331

Buchanan Ingersoll, PC  □  100 SE 2nd Street, Suite 2100  □  Miami, FL 33131-2150  □  (305) 347-4080

# PUBLIC RECORDS   DL Search Results

| Main Menu |
| **DL Menu** |

---

████████████████████

**Click on any COLORED text to view the full record.**

| # | Name | S | DOB | Address | City | Lic. # | SSN | Iss | Added* |
|---|------|---|-----|---------|------|--------|-----|-----|--------|
| 1 | ANDERSON, OHMER J | M | 10/20/31 | 1831 RIVERVIEW RD | DEERFIELD BEACH | A536650313800 | 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 | 09/07/1994 | |
| 2 | ANDERSON, OHMER J | M | 10/20/31 | 1880 SE 14TH CT | DEERFIELD BEACH | A536650313800 | 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 | 09/07/1994 | 12/10/1998 |

████████████████████

*Added is the date in which record was added to Public Records Online's Database

JAN 12 2000 09:43        EXHIBIT " 1 "        3059690987        PAGE.01


 **DMV Search Results**



Click on the **NAME** text to view the full record.
Click on the **VIN** text to view vehicle registration history.

| # | Name | Sex | DOB | Posted | Address | City | Yr/Make | Tag/Title | VIN |
|---|------|-----|-----|--------|---------|------|---------|-----------|-----|
| 1 | **ANDERSON OHMER J OR OPAL A** | M | 10/20/31 | 03/21/95 | 1631 RIVERVIEW RD | DEERFIELD BEACH | 1992 PONT | JQF83Y 62421770 | **1G2HZ52L9N12428** |
| 2 | **ANDERSON OHMER J OR OPAL A** | M | 10/20/31 | 09/12/97 | 1560 SE 14 CT | DEERFIELD BEACH | 1992 PONT | VGE80T 62421770 | **1G2HZ52L9N12428** |
| 3 | **ANDERSON, OHMER J.** | M | 10/20/31 | 10/15/98 | 1560 SE 14 CT | DEERFIELD BEACH | 1998 CADI | VGE80T 74100315 | **1G6KY5492WU914** |
| 4 | **ANDERSON, OHMER - OR OPAL -** | M | 10/20/31 | 06/04/99 | 1560 SE 14TH COURT | DEERFIELD BEACH | 1989 ROLL | A16AFR 47313730 | **SCAZD02A4KCX25** |
| 5 | **ANDERSON, OHMER - OR OPAL -** | M | 10/20/31 | 06/04/99 | 1560 SE 14TH COURT | DEERFIELD BEACH | 1989 ROLL | A16AFR 47313730 | **SCAZD02A4KCX25** |
| 6 | **ANDERSON, OHMER J.** | M | 10/20/31 | 09/16/99 | 1560 SE 14 CT | DEERFIELD BEACH | 1998 CADI | VGE80T 74100315 | **1G6KY5492WU914** |
| 7 | **ANDERSON, OHMER J.** | M | 10/20/31 | 10/12/99 | 1560 SE 14 CT | DEERFIELD BEACH | 1998 CADI | VGE80T 74100315 | **1G6KY5492WU914** |
| 8 | **ANDERSON, OHMER - OR OPAL -** | M | 10/20/31 | 10/09/99 | 1560 SE 14 CT | DEERFIELD BEACH | 1989 ROLL | A16AFR 47313730 | **SCAZD02A4KCX25** |

 ## Property Search



**Click On A Colored Name**
**To View History Of Name.**

**Click On A Colored Parcel #**
**To View History Of Parcel.**

| # Name/Address | Roll Year | Parcel # |
|---|---|---|
| **ANDERSON,OHMER J & OPAL A** 1 1631 RIVERVIEW RD APT 107 DEERFIELD BEACH FL 33441 | 93 | 484305AJ0070 |
| **ANDERSON,OHMER J & OPAL A** 2 1631 RIVERVIEW RD APT 107 DEERFIELD BEACH FL 33441 | 94 | 484305AJ0070 |
| **ANDERSON,OHMER J & OPAL A** 3 1631 RIVERVIEW RD APT 107 DEERFIELD BEACH FL 33441 | 95 | 484305AJ0070 |
| **ANDERSON,OHMER J & OPAL A** 4 1631 RIVERVIEW RD APT 107 DEERFIELD BEACH FL -4332 33441 | 96 | 484305AJ0070 |
| **ANDERSON,OHMER J &** 5 1560 SE 14TH CT DEERFIELD BEACH FL -7332 33441 | 96 | 484308070080 |
| **ANDERSON,OHMER J & OPAL A** 6 1560 SE 14 CT DEERFIELD BEACH FL -7332 33441 | 98 | 484308070080 |
| **ANDERSON,OHMER J & OPAL A** 7 1560 SE 14 CT DEERFIELD BEACH FL -7332 33441 | 97 | 484308070080 |

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL CIVIL DIVISION

CASE NO: 99-021135 CACE 07

OHMER JACK ANDERSON,

        Plaintiff,

v.

OSAGE SYSTEMS GROUP, INC.

        Defendant.

_____/

## OSAGE SYSTEMS GROUP, INC.'S ANSWER AND DEFENSES

    Defendant, Osage Systems Group, Inc. (hereinafter "Osage"), by and through its undersigned counsel, files its Answer and Defenses to the Complaint of Ohmer Jack Anderson (hereinafter "Anderson"), stating as follows:

### ANSWER

    1.    Osage admits the allegations of paragraphs 1 and 2 of Anderson's Complaint for jurisdictional purposes.

    2.    Osage admits the allegations contained in paragraph 3, 4, 5 and 6 of Anderson's Complaint.

    3.    Osage denies the allegations contained in paragraph 7 of Anderson's complaint and therefore denies same and demands strict proof thereof.

    4.    Osage admits the allegations contained in paragraphs 8 and 9 of Anderson's Complaint.

CASE NO: 99-021135 CACE 07

5.    In response to paragraph 10 of Anderson's Complaint, Osage admits that Osage stock was to be restricted in that it was not yet registered under the Securities Act of 1933 but denies the remaining allegations contained therein and demands strict proof thereof. By way of further response, Osage states that Exhibit "A" to the Complaint is a writing which speaks for it self and objects to any characterizations of its content by Anderson.

6.    Osage denies the allegations contained in paragraph 11 of Anderson's Complaint and demands strict proof thereof. By way of further response, Osage states that Exhibit "A" to Anderson's Complaint is a writing which speaks for itself and objects to any characterization of its content by Anderson.

7.    Osage admits the allegations contained in paragraphs 12 and 13 of Anderson's Complaint.

8.    In response to paragraph 14 of Anderson's Complaint, Osage admits to conveying certain stock certificates to Anderson in accordance with the Stock Purchase Agreement but is without sufficient knowledge to either admit or deny the remaining allegations contained therein and, therefore, denies same and demands strict proof thereof.

9.    Osage admits the allegations contained in paragraphs 15 and 16 of Anderson's Complaint.

10.    Osage denies the allegations contained in paragraph 17 of Anderson's Complaint and therefore denies same and demands strict proof thereof.

2

CASE NO:  99-021135 CACE 07

11.    Osage admits the allegations contained in paragraphs 18 and 19 of Anderson's Complaint.

12.    Osage has no knowledge of the allegations contained in paragraph 20 of Anderson's Complaint and therefore denies same and demands strict proof thereof.

13.    Osage denies the allegations contained in paragraph 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30 of Anderson's Complaint and therefore denies same and demands strict proof thereof.

14.    Osage has no knowledge of the allegations contained in paragraph 31 of Anderson's Complaint and therefore denies same and demands strict proof thereof.

15.    Osage denies the allegations contained in paragraph 32 of Anderson's Complaint and therefore denies same and demands strict proof thereof.

16.    Osage denies the allegations contained in paragraph 33, 34, 35, 36, 37 and 38 of Anderson's Complaint.

17.    Osage denies all other allegations contained in Anderson's Complaint not previously responded to herein.

NOW THEREFORE, having responded to all of the allegations contained in Anderson's Complaint, Osage states its affirmative defenses as follows:

**FIRST DEFENSE**

18.    Anderson's complaint fails to state a claim upon which relief may be granted, in that it seeks recovery of damages which are inconsistent with the express provisions of the Agreements sued upon.

3

CASE NO:  99-021135 CACE 07

## SECOND DEFENSE

19.     Anderson is not entitled to recovery of an "adjusted amount" pursuant to §1.3 of the

Purchase Agreement in that the "registration value" of the subject shares equaled or exceeded $6 per

share on the "registration date" as defined in the Agreements sued upon.

## THIRD DEFENSE

20.     Anderson is precluded from recovery herein in that the damages for which he

seeks recovery are so vague and indefinite as to be speculative.

## FOURTH DEFENSE

21.     Anderson is precluded from recovery of damages herein in that the subject shares

have not been effectively registered and, therefore, there has been a failure of condition precedent

pursuant to the terms of the Agreements sued upon.

WHEREFORE, Defendant Osage Systems Group, Inc. demands that judgment be entered in

its favor and against Plaintiff, Ohmer Jack Anderson together with interest, costs of suit, and such

other relief as this Court deems just, equitable and proper.

Respectfully submitted,
BUCHANAN INGERSOLL, P.C.
Attorneys for Defendant
2100 NATIONSBANK TOWER
100 SOUTHEAST SECOND STREET
Miami, Florida 33131
(305) 347-4080
FAX:  347-4089

WILLIAM E. DAVIS, ESQ.
Florida Bar No.: 191680

4

CASE NO: 99-021135 CACE 07

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true copy of the foregoing was mailed this _14_ day of

January, 2000 to: Jeffrey B. Smith, Kelley, Herman & Smith, Attorneys for Plaintiff, 1401 East

Broward Boulevard, Suite 206, Fort Lauderdale, FL 33301.

_____
WILLIAM E. DAVIS, ESQ.
Florida Bar No.: 191680

35327

5

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL CIVIL DIVISION

CASE NO: 99-021135 CACE 07

OHMER JACK ANDERSON,

      Plaintiff,

v.

OSAGE SYSTEMS GROUP, INC.

      Defendant.

_____/

## NOTICE OF REMOVAL OF ACTION

PLEASE TAKE NOTICE that a Notice of Removal has been signed pursuant to

Fed.R.Civ.P. 11, a copy of which is attached hereto, and was filed in the Office of the Clerk of

the United States District Court for the Southern District of Florida this *14* day of January

2000.

      Respectfully submitted,
      BUCHANAN INGERSOLL, P.C.
      Attorneys for Defendant
      2100 NATIONSBANK TOWER
      100 SOUTHEAST SECOND STREET
      Miami, Florida 33131
      (305) 347-4080
      FAX: 347-4089

      WILLIAM E. DAVIS, ESQ.
      Florida Bar No.: 191680

CASE NO: 99-021135 CACE 07

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true copy of the foregoing was mailed this _14_ day of

January, 2000 to: Jeffrey B. Smith, Kelley, Herman & Smith, Attorneys for Plaintiff, 1401 East

Broward Boulevard, Suite 206, Fort Lauderdale, FL 33301.

WILLIAM E. DAVIS, ESQ.
Florida Bar No.: 191680

35343

2

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL CIVIL DIVISION

CASE NO:  99-21135 (07)

OHMER JACK ANDERSON,

        Plaintiff,

v.

OSAGE SYSTEMS GROUP, INC.

        Defendant.

_____/

## NOTICE OF APPEARANCE

The law firm of Buchanan Ingersoll, Professional Corporation hereby files its appearance

on behalf of Defendant, Osage Systems Group, Inc. and requests that it be served with copies of

all pleadings, notices, motions, orders and other documents filed in this proceeding.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true copy of the foregoing was mailed this 2 2 day of

December 1999 to:  Jeffrey B. Smith, Esq., Kelley, Herman & Smith, 1401 East Broward Boulevard

Suite 206, Fort Lauderdale, FL 33301.

BUCHANAN INGERSOLL, P.C.
Attorneys for Defendant
2100 NATIONSBANK TOWER
100 SOUTHEAST SECOND STREET
Miami, Florida 33131
(305) 347-4080
FAX: 347-4089

_____
WILLIAM E. DAVIS, ESQ.
Florida Bar No.: 191680

34816

# United States Corporation Company

1013 Centre Road, Wilmington, DE, 19805-1297
(302) 636-5400

United States Corporation Company                                    The Prentice-Hall Corporation System, Inc.

## NOTICE OF SERVICE OF PROCESS

Date Processed: 16-DEC-99                                    Transmittal #:  DE0811681C          ALL

To:  STEPHEN M. COHEN, ESQ.                          Redirect sent to:
     BUCHANAN INGERSOLL, P.C.
     11 PENN CENTER
     1835 MARKET STREET 14THFL
     PHILADELPHIA PA 191032895

TYPE OF REPRESENTATION:  Statutory

*We enclose the following documents which were served upon:*
                                              Corporation Service Company
*as registered agent in   Delaware        for*
                              **OSAGE SYSTEMS GROUP, INC. (ID#:  1584274)**
*Documents were served on   16-DEC-99     via Personal Service*              ID#: N/A

Title of Action:  OHMER JACK ANDERSON                              Case #: 99021135
            vs.  OSAGE SYSTEMS GROUP, INC.
         Court:  CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT FOR BROWARD COUNT
Nature of Case:
                 BREACH OF AGREEMENTS

| X | Summons | | _____ Notice of Mechanic's Lien | | _____ A self-addressed stamped |
|---|---------|---|---|---|---|
| X | Complaint | | _____ Notice of Attorney's Lien | | envelope enclosed |
| _____ | Garnishment | | _____ Notice of Default Judgment | | _____ Duplicate copies of the Notice |
| _____ | Subpoena | | | | and Acknowledgement enclosed |

  X   Other:  EXHIBITS

     Answer Due:  WITHIN 20 DAYS AFTER SERVICE
Documents Sent:  Federal Express          ID#:
    Call Placed:  No call placed           Spoke to:  N/A
      Comments:  N/A

**Attorney for Claimant:**
      JEFFREY B. SMITH
      KELLEY, HERMAN & SMITH
      1401 EAST BROWARD BLVD., SUITE 206
      FT. LAUDERDALE, FL 33301
      954-462-7806

Form Prepared By:  Carol Gajewski
*Please acknowledge receipt of this notice and the enclosures by signing and returning this acknowledgement copy. A business reply*
*envelope is enclosed for your convenience.*

**DATE RECEIVED:**_____      **CLIENT SIGNATURE:**_____
                         Acknowledgement Copy - to be returned to the address above

The information on this transmittal is provided for use in forwarding the attached documents. This information does not constitute a legal opinion as to the facts or
details of this action. These should be obtained from the documents themselves. The receiver of this transmittal is responsible for interpreting the documents and
for taking appropriate action. If you have received only a copy of the transmittal, you should be aware that the documents have been sent to the original addressee.
You should contact that addressee for details or interpretations of the content of those documents.

# United States Corporation Company
## 1013 C␣␣re Road, Wilmington, DE, 1␣␣5-1297
### (302) 636-5400

United States Corporation Company | The Prentice-Hall Corporation System, Inc.

## NOTICE OF SERVICE OF PROCESS

**Date Processed:** 16-DEC-99 | **Transmittal #:** DE0811681C ALL

To: STEPHEN M. COHEN, ESQ.
BUCHANAN INGERSOLL, P.C.
11 PENN CENTER
1835 MARKET STREET 14THFL
PHILADELPHIA PA 191032895

**Redirect sent to:**

**TYPE OF REPRESENTATION:** Statutory

*We enclose the following documents which were served upon:*
Corporation Service Company
*as registered agent in* Delaware *for*
**OSAGE SYSTEMS GROUP, INC. (ID#: 1584274)**
*Documents were served on 16-DEC-99 via Personal Service* **ID#:** N/A

**Title of Action:** OHMER JACK ANDERSON **Case #:** 99021135
**vs.** OSAGE SYSTEMS GROUP, INC.
**Court:** CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT FOR BROWARD COUNT
**Nature of Case:**
BREACH OF AGREEMENTS

| | | |
|---|---|---|
| X Summons | ____ Notice of Mechanic's Lien | ____ A self-addressed stamped envelope enclosed |
| X Complaint | ____ Notice of Attorney's Lien | |
| ____ Garnishment | ____ Notice of Default Judgment | ____ Duplicate copies of the Notice and Acknowledgement enclosed |
| ____ Subpoena | | |

X Other: EXHIBITS

**Answer Due:** WITHIN 20 DAYS AFTER SERVICE
**Documents Sent:** Federal Express **ID#:**
**Call Placed:** No call placed **Spoke to:** N/A
**Comments:** N/A

**Attorney for Claimant:**
JEFFREY B. SMITH
KELLEY, HERMAN & SMITH
1401 EAST BROWARD BLVD., SUITE 206
FT. LAUDERDALE, FL 33301
954-462-7806

Form Prepared By: Carol Gajewski

*Please acknowledge receipt of this notice and the enclosures by signing and returning the acknowledgement copy.*

### Original Client Copy - for your records

The information on this transmittal is provided for use in forwarding the attached documents. This information does not constitute a legal opinion as to the facts or details of this action. These should be obtained from the documents themselves. The receiver of this transmittal is responsible for interpreting the documents and for taking appropriate action. If you have received only a copy of the transmittal, you should be aware that the documents have been sent to the original addressee. You should contact that addressee for details or interpretations of the content of those documents.

CACE

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA

OHMER JACK ANDERSON,

CASE NO:

    Plaintiff,

VS.

OSAGE SYSTEMS GROUP, INC.

**99021135**
**07**

    Defendant.

_____/

TO:  **OSAGE SYSTEMS GROUP, INC.**
     **By Serving Its Registered Agent**
     **CORPORATION SYSTEMS**
     **1013 CENTRE ROAD**
     **Wilmington, Delaware 19805**

**S U M M O N S**
**PERSONAL SERVICE**
**ON A NATURAL PERSON**

**IMPORTANT**

    A lawsuit has been filed against you. You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, includ-ing the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

    If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the Plaintiff/Plaintiffs Attorney named below.

**IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT OF 1990 (ADA), DISABLED PERSONS WHO, BECAUSE OF THEIR DISABILITIES, NEED SPECIAL ACCOMMODATION TO PARTICIPATE IN THIS PROCEEDING SHOULD CONTACT THE ADA COORDINATOR AT 201 SOUTHEAST 6TH STREET, ROOM 136, FORT LAUDERDALE, FLORIDA, 33301 OR TELEPHONE VOICE/TDD (954) 357-6364 NOT LATER THAN FIVE BUSINESS DAYS PRIOR TO SUCH PROCEEDING.**

**IMPORTANTE**

    Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escripto, y presentarla ante este tribunal. Un llamada telefonica no lo protegera. Si usted dese que el tribunal considere

su defensa, debe presentar su respuesta por escrito, incluyendo el
numero del caso y los nombres de las partes interesadas.  Si usted
no contesta la demanda a tiempo, pudiese perder el caso y podria
ser despojado de sus ingresos y propiedades, o privado de sus dere-
chos, sin previo aviso del tribunal. Existen otros requistos legal-
es. Si lo desea puede usted consultar a un abogado inmediatamente.
Si no conoce a un abogado, pueda llmar a una de las oficinas de
asistencia legal que aparecen en la guia telefonica.

     Si desea responder a la demanda por su cuenta, al mismo tiempo
en que presenta su respuesta ante el tribunal, debera usted envivar
por correo o entregar una copia de su respuesta a la persona dono-
minada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o
Abogado del Demandante).

<u>**IMPORTANT**</u>

   Des poursuites judiciares ont ete entreprises contre vous. Vous
avez 20 jours consecutifs a partir de la date de l'assignation de
cette citation pour deposer une reponse ecrite a la plainte cijoin-
te aupres de ce tribunal. Un simple coup de telephone est insuffis-
sant pour vous proteger. Vous estes oblige de deposer votre reponse
ecrite, avec mention du numero de dossier ci-dessus et du nom des
parties nommees ici, si vous souhaitez que le tribunal entende
votre cause.  Si vous ne deposez pas votre reponse ecrite dans le
relai requis, vous risquez de perdre la cause ainsi que votre sal-
aire, votre argent, et vous biens peuvent etre saisis par la suite,
sans aucun preavis ulterieur du tribunal. Il y a d'autres obliga-
tions juridiques et vous pouvez requerir les services immediats
d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez
telephoner a un service de reference d'avocat, ou a un bureau
d'assistance juridique (figurant a l'annuaire de telephones).

     Si vous choisissez de deposer vous-meme une reponse ecrite, il
vous faudra egalement, en meme temps que cette formalite, faire
parvenir ou expedier une copie de votre reponse ecrite au Plaintiff
\Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

                              KELLEY, HERMAN & SMITH
                              Attorneys for Plaintiff
                              1401 East Broward Blvd.
                              Suite 206
                              Ft. Lauderdale, Florida 33301
                              (954) 462-7806
                              JEFFREY B SMITH
                              _____
                              JEFFREY B. SMITH
                              Florida Bar No: 356050

**THE STATE OF FLORIDA**

**TO EACH SHERIFF OF THE STATE:**   You are commanded to serve this summons and a copy of the Complaint in this lawsuit on the above-named defendant.

DATED ON  , 19___.

ROBERT E. LOCKWOOD

(SEAL)          CLERK OF THE CIRCUIT COURT

By 

3

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA

OHMER JACK ANDERSON,

     Plaintiff,

CASE NO:
Florida Bar No: 356050

VS.

OSAGE SYSTEMS GROUP, INC.

**99021135**

     Defendant.
_____/

## COMPLAINT FOR DAMAGES

**COMES NOW THE** Plaintiff, OHMER JACK ANDERSON a/k/a O. JACK ANDERSON ("ANDERSON") and sues the Defendant, OSAGE SYSTEMS GROUP, INC. ("OSAGE") and alleges:

### *Introduction*

1. That this is an action which seeks damages in excess of Fifteen Thousand ($15,000.00) Dollars exclusive of interest, costs and attorney's fees and is within the jurisdiction of this Court.

2. That ANDERSON is an individual over the age of eighteen (18) years and is otherwise sui juris.

3. That at all material times prior to April 24, 1998, ANDERSON was the owner of one hundred (100) percent of the issued and outstanding capital stock of Open System Technologies, Inc., a Delaware Corporation (the "Open System Stock").

4. That OSAGE is a corporation organized under the laws of the State of Delaware and at all times material to the allegations herein had an office in Broward County, Florida and was conducting business in Broward County, Florida.

5. That on and from April 24, 1998, OSAGE was the owner of

1

one hundred (100%) percent of the issued and outstanding capital stock of Open System Technologies, Inc. and further conducted business in Broward County, Florida by and through Open System Technologies, Inc. as its wholly owned subsidiary.

6.   That the monies due to ANDERSON from OSAGE and sought within this Complaint for Damages were to have been due and payable to ANDERSON in Broward County, Florida.

7.   That all conditions precedent to the maintenance of this action have been satisfied.

### The Stock Purchase Agreement

8.   That on April 24, 1998 ANDERSON and OSAGE entered into a Stock Purchase Agreement ("the Purchase Agreement") in Broward County, Florida wherein among other things OSAGE agreed to purchase from ANDERSON and ANDERSON agreed to sell to OSAGE the Open System Stock. A copy of the Purchase Agreement is attached hereto, labeled as Exhibit "A" and the contents thereof are incorporated herein by reference as if set forth in full.

9.   That as partial consideration for OSAGE's purchase of the Open System stock, OSAGE agreed to deliver and convey to ANDERSON certain restricted shares of the common stock of OSAGE (the "restricted stock") having an aggregate closing value (as defined within paragraph 1.2(b) of the Agreement) equal to Two Million ($2,000,000.00) Dollars.

10. That as provided by paragraph 3.34 of the Purchase Agreemen the OSAGE stock was to be "restricted" in that it was not then registered in accordance with the Securities Act of 1933 (the Act")

2

and ANDERSON could not sell or otherwise dispose of the OSAGE stock except in accordance with Rule 144 of the Act, in accordance with an applicable exemption from registration under the Act or unless there was a registration of the restricted stock in accordance with the Act.[1] Paragraph 3.34(b) of the Purchase Agreement further mandated that the certificates representing the restricted stock contain a restrictive legend attesting to this restriction (the "legend").

### *Osage Promised To Pay Additional Cash To Anderson*

11.  That paragraph 1.3 of the Purchase Agreement obligated OSAGE to pay ANDERSON additional cash ("the additional cash") in the event that the value of the Restricted Stock fell below Two Million ($2,000,000.00) Dollars as of the date that a registration statement which OSAGE was obligated to file with the Securities and Exchange Commission became effective.  Paragraph 1.3 provides as follows:

"Adjustment Amount.

Buyer agrees to pay to Shareholder, in cash, the difference between (i) the "Registration Value" (as de- fined below) of the Stock Consideration on the "Registr- ation Date" (also as defined below), and (ii) $2,000,000, provided the Registration Value is lower than $2,000,000 (such lesser amount hereinafter referred to as the "Adjustment Amount").  The "Registration Value" shall be an amount equal to the average closing price per share of the Osage Stock on the principal exchange, market or quotation system upon which such shares regularly trade at the time, for the twenty (20) trading days preceding

---

[1] Anderson was in fact further restricted in his ability to sell the restricted stock by paragraph 5.20 of the Purchase Agreement which contains a blanket prohibition against Anderson selling the restricted stock until the effective date of the "Registration Statement" (as defined herein).

the "Registration Date" multiplied by the number of
shares of the Osage Stock included in the Stock Consider-
ation. The "Registration Date" shall be defined as the
earlier of (i) the date that the public resale of such
shares is permitted pursuant to an effective registration
statement filed with the Securities and Exchange Commis-
sion; or (ii) the date that the public resale of some or
all of the Shares is permitted by virtue of Rule 144
promulgated under the Act, to the extent that Rule 144
permits the public resale of such shares.  In the absence
of an effective registration statement, the Adjustment
Amount shall only be determined as to that number of
shares of the Stock Consideration that may be publicly
resold pursuant to Rule 144.  Payment of the Adjustment
Amount shall be made within fifteen (15) days of the
determination thereof."

### *The Closing*

12. That the initial transactions contemplated by the Agree-

men were consummated and closed in Broward County, Florida on April

24, 1998 (the "closing") and ANDERSON simultaneously conveyed the

Open System Stock to OSAGE.

13. That pursuant to the formula contained within the Agree-

ment for the calculation of the number of shares of the restricted

stock to be conveyed to ANDERSON, OSAGE at closing issued to

ANDERSON two (2) stock certificates (the "stock certificates") re-

presenting 333,334 shares of OSAGE stock and each certificate

contained a legend.  Copies of both stock certificates are attached

hereto, labeled as Composite Exhibit "B" and the contents thereof

are incorporated herein by reference as if set forth in full.

14. That one of the stock certificates was conveyed to ANDER-

SON at closing and the other stock certificate, in accordance with

the Stock Purchase Agreement, was placed in escrow with ANDERSON's

attorneys and only released to ANDERSON on or about April 21, 1999.

4

### *The Registration Rights Agreement*

15.  That as required by the Purchase Agreement the parties at closing also executed a Registration Rights Agreement (the "Registration Agreement") which set forth the parties' agreement concerning the registration of the restrictive stock.  A copy of this Registration Agreement is attached hereto, labeled as Exhibit "C" and the contents thereof are incorporated herein by reference as if set forth in full.

16. That the Registration Agreement imposed an obligation upon OSAGE to "use its best efforts to prepare and file, not later than May 25, 1999, a registration statement with the United States Securities and Exchange Commission and to use its best efforts to, as promptly as possible have such registration statement declared effective for purposes of facilitating the public resale of the Restricted Stock."

17.  That the execution of the Registration Agreement was necessary to insure that ANDERSON would be able to resell the restricted stock.  Absent OSAGE's obligation to prepare, file and have the registration statement declared effective, ANDERSON would have been left without the ability to sell the restrictive stock and to realize the full value of this consideration.

### *Osage Files Registration Statement*

18. That paragraph 5.20 of the Purchase Agreement specifically prohibited ANDERSON from selling, transferring or otherwise disposing of the restricted stock until the effective date of the registration statement, which OSAGE was required to file with the

5

United States Securities and Exchange Commission.

19. That OSAGE filed a registration statement (the "registration statement") on or about April 28, 1999, which registration statement although not then effective, did include the restricted stock.

### *Osage Stock Price Falls*

20.  That since the date of closing, the price per share of OSAGE stock on the principal exchange, market or quotation system upon which its shares regularly trade has plummeted from the above Six ($6.00) Dollar per share price at or about the time of closing and have recently been trading at less than Two ($2.00) Dollars per share.

### *Osage Breach Of Agreements*

21. That despite OSAGE's obligation to use its best efforts to as promptly as possible have the registration statement declared effective for the purpose of facilitating the public resale of the restricted stock (and ANDERSON's demand that it do so), it has not done so.

22.  That OSAGE failed to use its best efforts to have the registration statement declared effective for the purpose of facilitating the public resale of the restricted stock.

23.  That OSAGE has failed to act promptly as possible to have the registration statement declared effective for the purpose of facilitating the public resale of the restricted stock.

24.  That OSAGE has failed to have the registration statement declared effective for the purpose of facilitating the public

6

resale of the restricted stock within a reasonable time.

25.  That OSAGE has failed to expend reasonable efforts to have the registration statement declared effective for the purpose of facilitating the public resale of the restricted stock.

26.  That in fact, OSAGE has intentionally and deliberately failed and refused to take the necessary actions to have the registration statement declared effective for the purpose of facilitating the pubic resale of the restricted stock.

27.  That OSAGE has intentionally and deliberately acted so as to postpone the "registration date" by its actions in not having the registration statement declared effective in order to postpone and/or attempt to avoid paying ANDERSON the additional cash.

28.  That at all times material, OSAGE has had the ability to have the registration statement declared effective for the purpose of facilitating the public resale of the restricted stock within a reasonable time.

29.  That OSAGE has acted in bad faith and in violation of its implied obligation within both the Purchase Agreement and the Registration Agreement to deal in good faith with ANDERSON.

30.  That OSAGE has breached its obligations under the Purchase Agreement and the Registration Agreement.

### *Anderson's Damages*

31.  That the value of the restricted stock has fallen below Two Million ($2,000,000.00) Dollars.

32.  That as set forth within paragraph 1.3 of the Purchase Agreement, ANDERSON was entitled to a cash payment in the event

7

that the "registration value" was lower than Two Million ($2,000,000.00) Dollars on the "registration date."

33. That the "registration date" was defined as the date that the public resale of the restrictive stock was permitted pursuant to an effective registration statement filed with the Securities and Exchange Commission.[2]

34. That OSAGE's desire to postpone the registration date is due to its desire to postpone its obligation to pay ANDERSON the additional cash within fifteen (15) days following the registration date.

35. That as a result of OSAGE's actions in artificially postponing the "registration date", ANDERSON has been unable to sell any of his restricted stock and the value of the restrictive stock has fallen from the time OSAGE should have reasonably achieved a registration date.

36. That had OSAGE acted properly and in accordance with its obligations under the Purchase Agreement and the Registration Agreement, ANDERSON would have realized the Two Million ($2,000,000.00) Dollar value of the restricted stock.

37. That ANDERSON has been deprived of the Two Million ($2,000,000.00) Dollar combined value of the restricted stock and

---

[2] That although paragraph 1.3 defines the "registration date" as the earlier of (i) the date that the public resale of the restrictive stock is permitted pursuant to an effective registration statement or (ii) the date that the public resale of some or all of the shares is permitted by virtue of rule 144 promulgated under the act, paragraph 5.20 of the Purchase Agreement eliminated the second option by restricting ANDERSON's ability to sell, transfer or otherwise dispose of the restricted stock until the effective date of the "registration statement."

the additional cash on and from the date that OSAGE using its best efforts and acting promptly as possible should have had the registration statement declared effective for purposes of facilitating ANDERSON's public resale of the restricted stock.

38. That as a result of OSAGE's breach, ANDERSON has been damaged.

**WHEREFORE** Plaintiff, OHMER JACK ANDERSON a/k/a O. JACK ANDERSON demands Judgment for damages against OSAGE SYSTEMS GROUP, INC. in the principal amount of Two Million ($2,000,000.00) Dollars, together with general damages, prejudgment interest and costs of suit.

```
Kelley, Herman & Smith
Attorneys for
1401 East Broward Blvd.
Suite 206
Ft. Lauderdale, Florida 33301
(954) 462-7806
```

JEFFREY B. SMITH

C:\TEXT\ANDERSON\COMPLAIN.WPD

9

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement"), made this 24th day of April, 1998, by and between Osage Systems Group, Inc., a Delaware corporation, formerly known as Pacific Rim Entertainment, Inc. ("Buyer"), and O. Jack Anderson, the sole shareholder (the "Shareholder,") of Open System Technologies, Inc., a Delaware corporation (the "Company").

## WITNESSETH:

WHEREAS, Shareholder owns 100% of the issued and outstanding capital stock of the Company, consisting of 10 shares of common stock, no par value (the "Shares"); and

WHEREAS, Shareholder desires to sell, and Buyer desires to purchase, all of the Shares for the consideration and on the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## SALE AND TRANSFER OF SHARES

1.1     Sale and Purchase of the Shares.

Subject to the terms and conditions of this Agreement, at the "Closing" (as defined herein), Shareholder shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and accept from Shareholder, the Shares, in the manner and for the consideration set forth in this Article 1.

1.2     Consideration.

Shareholder shall deliver to Buyer good and sufficient certificates for the Shares, duly assigned in blank, with any required transfer stamps or taxes paid and affixed thereto and cause the entire right, title and interest in and to the Shares to be transferred of record to Buyer, free and clear of any claim, suit, proceeding, call, commitment, voting trust, proxy, restriction, limitation, security interest, pledge, lien or encumbrance of any kind or nature whatsoever, other than restrictions under the Securities Act of 1933, as amended (the "Act"), or applicable state securities laws; and in consideration thereof Buyer shall pay and deliver to Shareholder as the purchase price for the Shares, the following:

(a)     At the Closing, the sum of Two Million Five Hundred Thousand Dollars ($2,500,000) in cash, cashier's check or by wire transfer to the account specified in writing to Buyer at least one (1) day prior to Closing.

EXHIBIT "A"

(b)    At the Closing, subject to Section 1.4 relating to the establishment of the "Escrow Fund" (as defined below), delivery of certificates representing that number of shares of the common stock, par value $0.01 per share, of Buyer (the "Osage Stock") having an aggregate Closing value (the "Closing Value") equal to $2,000,000, such number of shares of Osage Stock is hereinafter referred to as "Stock Consideration". For purposes of the Agreement, the Closing Value shall be determined based upon the lesser of: (x) $6.00 per share of Osage Stock, or (y) the average closing price on the NASDAQ OTC Bulletin Board of the Osage Stock for the ten (10) trading days ending five (5) trading days preceding the Closing Date.

(c)    Subsequent to Closing, but payable no later than March 31, 1999, the sum of $260,000 in cash, cashier's check or by wire transfer to the accounts specified in writing to Buyer.

Clauses (a) - (c), together with the Adjustment Amount, as provided in Section 1.3 herein, shall constitute the "Purchase Price".

1.3    Adjustment Amount.

Buyer agrees to pay to Shareholder, in cash, the difference between (i) the "Registration Value" (as defined below) of the Stock Consideration on the "Registration Date" (also as defined below), and (ii) $2,000,000, provided the Registration Value is lower than $2,000,000 (such lesser amount hereinafter referred to as the "Adjustment Amount"). The "Registration Value" shall be an amount equal to the average closing price per share of the Osage Stock on the principal exchange, market or quotation system upon which such shares regularly trade at the time, for the twenty (20) trading days preceding the "Registration Date" multiplied by the number of shares of the Osage Stock included in the Stock Consideration. The "Registration Date" shall be defined as the earlier of (i) the date that the public resale of such shares is permitted pursuant to an effective registration statement filed with the Securities and Exchange Commission; or (ii) the date that the public resale of some or all of the Shares is permitted by virtue of Rule 144 promulgated under the Act , to the extent that Rule 144 permits the public resale of such shares. In the absence of an effective registration statement, the Adjustment Amount shall only be determined as to that number of shares of the Stock Consideration that may be publicly resold pursuant to Rule 144. Payment of the Adjustment Amount shall be made within fifteen (15) days of the determination thereof.

1.4    Establishment of Escrow Fund.

At the Closing, Buyer shall deposit into escrow with an escrow agent mutually acceptable to Buyer and Shareholder (the "Escrow Agent"), 50% of the shares of Osage Stock included in the Stock Consideration (the "Escrow Fund"), which shall serve on a non-exclusive basis as collateral for the indemnification obligations of Shareholder pursuant to this Agreement. Buyer consents to the appointment of Thompson Hine & Flory LLP as the Escrow Agent. The deposit, maintenance and ultimate disposition of the Escrow Fund shall be governed by the terms of an escrow agreement, the form of which is attached hereto as Exhibit D (the "Escrow Agreement").

1.5    Establishment of Retention Plan for Key Employees.

Following Closing, Buyer shall establish a retention plan for "Key Employees" of the Company as of the Closing Date, comprised of a "Bonus Pool" of Five Hundred Thousand Dollars ($500,000), as more fully set forth in Section 5.13 hereof.

## ARTICLE II
## CLOSING.

2.1    Closing Date.

The purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of the Company located at 441 South State Road #7, Suite #1, Pompano Beach, Florida, at 9:30 a.m. (local time) on the later of (i) April 24, 1997 or (ii) at such other time and place as the parties may agree. The date of the Closing is hereinafter referred to as the "Closing Date." In no event shall the Closing take place later than May 4, 1998 (the "Termination Date"). Subject to the provisions of Article 8, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.1 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

2.2    Closing Transactions.

At the Closing, the following transactions shall occur, all of such transactions being deemed to occur simultaneously:

(a)    The Shareholder will deliver, or shall cause to be delivered, to the Buyer, the following documents and shall take the following actions:

(1)    The Shareholder shall surrender and deliver to the Buyer the certificate or certificates representing all of the Shares;

(2)    A certificate shall be executed by the Shareholder to the effect that: (i) all representations and warranties made by the Shareholder under this Agreement are true and correct as of the Closing, as though originally given to Buyer on said date; and (ii) the conditions precedent identified at Sections 6.2 and 6.3 have been satisfied;

(3)    A certificate of good standing shall be delivered by the Shareholder from the Secretary of State of the State of Delaware, dated at or about the Closing, to the effect that the Company is in good standing under the laws of such state;

(4)    An incumbency certificate shall be delivered by the Shareholder signed by all of the officers of the Company dated at or about the Closing;

(5)    Certified Certificate of Incorporation shall be delivered by the Shareholder dated at or about the Closing and a copy of the Bylaws of the Company certified by the Secretary of the Company dated at or about the Closing;

(6)    A registration rights agreement (the "Registration Rights Agreement"), the form of which is attached hereto as Exhibit A, shall be executed and delivered by the Shareholder;

(7)    A consulting agreement (the "Consulting Agreement"), the form of which is attached hereto as Exhibit B, shall be executed and delivered by Shareholder;

(8)    A noncompetition agreement (the "Noncompetition Agreement"), the form of which is attached hereto as Exhibit C, shall be executed and delivered by Shareholder;

(9)    The Escrow Agreement, in the form of Exhibit D, shall be executed and delivered by the Shareholder, Buyer and the Escrow Agent;

(10)    The Shareholder shall deliver the Escrow Fund into escrow pursuant to the terms of the Escrow Agreement;

(11)    Each of the officers and directors of the Company shall have tendered their resignation in form and substance satisfactory to Buyer, and concurrently therewith, Shareholder shall be elected to serve on the board of directors of the Company along with two of Buyer's appointees;

(12)    The delivery of an opinion of counsel of the Shareholder in form and substance satisfactory to the Buyer;

~~(13)    Shareholder executed Internal Revenue Form 8023 as more fully set forth in Section 5.14; and~~

(14)    Each of the parties to this Agreement shall have otherwise executed whatever documents and agreements, provided whatever consents or approvals and taken all such actions as are required under this Agreement.

(b)    Buyer will deliver, or shall cause to be delivered, to the Shareholder, the following documents and shall take the following actions:

(1)    Buyer shall deliver or shall cause to be delivered to the Shareholder a certificate or certificates representing the Stock Consideration;

(2)    Buyer shall deliver or shall cause to be delivered to the Shareholder, $2,500,000 by wire transfer of immediately available funds to the bank account designated in writing by the Shareholder at least one (1) day prior to Closing;

(3)    A certificate shall be executed by the Buyer's Chief Executive Officer to the effect that all representations and warranties of the Buyer under this Agreement are true and correct as of the Closing, as though originally given to the Shareholder on said date;

(4)     A certificate of good standing and certified copies of Buyer's certificate of incorporation shall be delivered by Buyer from the Secretary of the State of Delaware dated at or about the Closing that the Buyer is in good standing under the laws of said state;

(5)     Certified board resolutions shall be delivered by the Buyer dated at or about the Closing authorizing the transactions contemplated under this Agreement;

(6)     An incumbency certificate shall be delivered by Buyer signed by all of the officers thereof dated at or about the Closing;

(7)     Buyer will execute and deliver a Consulting Agreement with Shareholder, the form of which is attached hereto as Exhibit B;

(8)     Buyer will execute and deliver a Noncompetition Agreement with Shareholder, the form of which is attached hereto as Exhibit C;

(9)     Buyer will execute and deliver the Registration Rights Agreement with the Shareholder, the form of which is attached hereto as Exhibit A;

(10)    The delivery of an opinion of counsel of Buyer in form and substance satisfactory to the Shareholder;;

(11)    ~~Execution of Internal Revenue Form 8023 as more fully set forth in Section 5.14; and~~

(12)    Each of the parties to this Agreement shall have otherwise executed whatever documents and agreements, provided whatever consents or approvals and shall have taken all such actions as are required under this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER.

As a material inducement to Buyer to execute this Agreement and consummate the transactions contemplated hereby, the Shareholder hereby makes the following representations and warranties to Buyer. The representations and warranties are true and correct in all material respects at this date, and will be true and correct in all material respects on the Closing as though made on and as of such date.

3.1     Organization, Qualification and Status.

The Company is a corporation duly incorporated and organized, validly existing and in good standing under the laws of the State of Delaware. The Company has full corporate power and authority to own, lease and use its properties and to carry on its business as presently conducted. The Company is duly qualified or licensed to do business and in good standing as a foreign corporation in each of the jurisdictions in which the nature of its business or the character

-5-

of the properties and assets which it owns or leases makes such qualification or licensing necessary.

Except as set forth on Schedule 3.1 hereto, the Company has not, during the six- (6-) year period immediately preceding the date hereof, changed its name (other than from Computer Health & Safety, Inc.), been the surviving entity of a merger, consolidation or other reorganization, or acquired all or substantially all of the assets of any person or entity. Schedule 3.1 also sets forth all fictitious names under which the Company or such predecessors have conducted business.

3.2    Corporate Instruments and Records.

The copies of the Company's certificate of incorporation and bylaws, each certified by the Secretary of the Company and heretofore furnished to Buyer, are true, correct and complete and each include all amendments to the date hereof. The Company's minute books, as made available to Buyer, contain a true, complete and correct record of all corporate action taken on or prior to the date hereof at the meetings of its shareholders and directors and committees thereof. The stock certificate books and ledgers of the Company, as made available to Buyer for inspection, are true, correct and complete, and accurately reflect, at the date hereof, the ownership of the outstanding capital stock of the Company by the Shareholder.

3.3    Capitalization.

The authorized capital stock of the Company consists of 750 shares of common stock, no par value per share, of which 10 shares are issued and outstanding and constitute the Shares. The Shares are held beneficially and of record by the Shareholder, and 0 shares are held in the treasury of the Company. All of the Shares are validly issued, fully paid and non-assessable and entitled to vote at shareholder meetings, and none of the Shares has been issued in violation of any preemptive rights of shareholders or transferred in violation of any transfer restrictions relating thereto. There are no authorized or outstanding options, warrants, convertible securities, subscription rights, puts, calls, unsatisfied pre-emptive rights or other rights of any nature to purchase or otherwise receive, or to require the Company to purchase, redeem or acquire, any shares of the capital stock or other securities of the Company and there is no outstanding security of any kind convertible into such capital stock. There are no existing shareholder agreements, voting agreements or voting trusts respecting any shares of the capital stock of the Company. None of the shares of capital stock or other securities of the Company were issued in violation of the Act or any other legal requirement.

3.4    Ownership of Shares.

Shareholder owns and holds, beneficially and of record, the entire right, title and interest in and to the Shares, free and clear of any claim, suit, proceeding, call, commitment, voting trust, proxy, restriction, limitation, security interest, pledge or lien or encumbrance of any kind or nature whatsoever, and has full power and authority to vote said Shares and to approve the transactions contemplated by this Agreement, such Shares constituting, in the aggregate, all of the issued and

outstanding shares of capital stock of the Company. Shareholder has full power and authority to vote, transfer and dispose of the Shares, free and clear of any claim, suit, proceeding, call, voting trust, proxy, restriction, security interest, lien or other encumbrance of any kind or nature whatsoever other than restrictions under the Act and applicable state securities laws.

3.5    No Subsidiary.

The Company does not have any subsidiary or any ownership interest in any other entity. The Company is not a party to any joint venture arrangement and does not have the right to acquire any securities of or ownership interests in any other person or entity.

3.6    Authority of Shareholder.

Shareholder has full power and authority to enter into this Agreement, and to consummate the transactions contemplated hereby, without the consent of or notice to any third-party, and to comply with the terms, conditions and provisions hereof. This Agreement has been duly authorized, executed and delivered by Shareholder and is, and each other agreement or instrument of Shareholder contemplated by it will be, the legal, valid and binding agreement of the Shareholder, enforceable against the Shareholder in accordance with its terms. The execution, delivery and performance of this Agreement and the other agreements of the Shareholder contemplated hereby (collectively, the "Shareholder's Agreements") do not require the consent of or notice to any third-party. Neither the execution and delivery of the Shareholder's Agreements nor the consummation of the transactions contemplated thereby will conflict with or result in any violation of or constitute a default under any term of the certificate of incorporation or bylaws of the Company, or any agreement, mortgage, debt instrument, indenture, or other instrument, judgment, decree, order, award, law or regulation by which the Company or the Shareholder is bound, or result in the creation of any lien, security interest, charge or encumbrance upon any of the assets of the Company, or result in the cancellation, modification, revocation or suspension of any license, certificate, permit or authorization held by the Company, except as set forth in Schedule 3.6.

3.7    No Violation.

The Company is not in default under or in violation of any provision of (a) its certificate of incorporation or bylaws, or (b) any agreement, understanding, arrangement, indenture, contract, lease, sublease, loan agreement, note, restriction, obligation or liability to which it is a party or by which it is bound or to which it or its assets are subject (individually, an "Instrument" and collectively, the "Instruments"). Except as set forth in Schedule 3.7, neither the execution and delivery of this Agreement by the Shareholder, nor the consummation of the transactions contemplated hereby or thereby, nor compliance with the terms hereof or thereof, will (i) conflict with or result in a breach of any of the terms, conditions or provisions of the certificate of incorporation or bylaws of the Company, nor (ii) violate, conflict with or result in a breach of or default under any of the terms, conditions or provisions of any Instrument, nor (iii) accelerate or give to others any interests or rights, including rights of acceleration, termination, modification or cancellation, under any Instrument or in or with respect to the business or assets of the Company,

nor (iv) result in the creation of any lien, claim, charge or encumbrance on the assets, capital stock or properties of the Company, nor (v) conflict with, violate or result in a breach of or constitute a default under any law, statute, rule, judgment, order, decree, injunction, ruling or regulation of any government, governmental agency, authority or instrumentality, court or arbitration tribunal to which the Company or any of its assets or properties is subject, nor (vi) require the Company to give notice to, or obtain an authorization, approval, order, license, franchise, declaration or consent of, or make a filing with, any foreign, federal, state, county, local or other governmental or regulatory body or other person, other than any filings required to be made with the Federal Trade Commission ("FTC") and Antitrust Division of the Department of Justice ("Justice Department") of Notification and Report Forms pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act") and the rules promulgated thereunder.

3.8    Financial Statements.    _

Schedule 3.8 hereto contains true and correct and complete copies of the following financial statements of the Company at the dates and for the periods specified:

Audited financial statements of the Company for its two most recently completed fiscal years ended December 31, 1996 and December 31, 1997 (the "Audited Financial Statements") and unaudited financial statements as of the comparative three month periods ended March 31, 1998 and March 31, 1997 (the "Interim Financial Statements"). Unless otherwise referred to, the Audited Financial Statements and the Interim Financial Statements shall be referred to as the "Financial Statements." The Audited Financial Statements have been prepared in conformity with generally accepted accounting principles ("GAAP") applied on a consistent basis, and present fairly the financial position and results of operations and cash flows of the Company at the dates and for the periods specified. The Interim Financial Statements have been prepared on the basis of the Company's books and records and are true and accurate in all material respects. All liabilities and obligations of the Company outstanding as of the dates of the Financial Statements required to be reflected as liabilities in accordance with GAAP have been included in the Financial Statements. There have been no material changes in the financial condition, assets or liabilities of the Company from the date of the Interim Financial Statement to the date hereof, except changes in the ordinary course of business, none of which, either singly or in the aggregate, has been materially adverse. Since the date of the Interim Financial Statement, the Company has conducted its business in a normal and customary manner. The books and records of the Company from which the Financial Statements were prepared properly and accurately record the transactions and activities which they purport to record.

3.9    Absence of Undisclosed and Contingent Liabilities.

Except for obligations arising in the ordinary course of business after March 31, 1998, and other obligations of the Company under the Material Contracts and contracts that would be Material Contracts except for the amount involved, the Shareholder knows of no basis for the assertion against the Company by any person of a valid claim based on a liability which is not disclosed within the Financial Statements.

3.10    No Adverse Changes.

Since the date of the Interim Financial Statements the Company has been operated in the ordinary course and there has not been a material adverse change in the condition (financial or otherwise), properties, assets, liabilities, rights, operations or business of the Company.

3.11    Guarantees.

(a)    The Company has not guaranteed, become surety or contingent obligor for or assumed any obligation, debt or dividend of any person or entity. No assets owned by the Company are or have been pledged, hypothecated, delivered for safekeeping, subjected to a security interest or otherwise provided in any way as security for payment or performance of any obligation of a person other than the Company.

(b)    Schedule 3.11 identifies all obligations and liabilities of the Company for which the Shareholder has provided or been caused to incur personal guarantees thereof.

3.12    Tax Matters.

Except as set forth on Schedule 3.12 attached hereto:

(a)    The Company (i) has timely and properly filed or caused to be filed all tax returns which it is or has been required to file on or prior to the date hereof, by any jurisdiction to which it is or has been subject, all such tax returns being true and correct and complete in all respects, (ii) has timely paid or caused to be paid in full all taxes which are or have become due and payable to all taxing authorities with respect to such returns and periods, (iii) has made or caused to be made all withholdings of taxes required to be made by it, and such withholdings have either been paid to the appropriate governmental agency or set aside in appropriate accounts for such purpose, and (iv) has otherwise satisfied, in all material respects, all applicable laws and agreements with respect to the filing of tax returns and the payment of taxes.

(b)    The Company has properly accrued and reflected within its Financial Statements, and has thereafter to the date hereof properly accrued, and will from the date hereof through the Closing Date properly accrue, all liabilities for taxes and assessments, all such accruals being in the aggregate sufficient for payment of all such taxes and assessments.

(c)    There are no unassessed tax deficiencies proposed or threatened against the Company, nor are there any agreements, waivers, or other arrangements providing for extension of time with respect to the assessment or collection of any tax against the Company or any actions, suits, proceedings, investigations or claims now pending against the Company with respect to any tax, or any matter under discussion with any federal, state, local or foreign authority relating to any taxes.

(d)    The Company is not and has never been a member of an affiliated group of corporations (within the meaning of Section 1504 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code")).

(e)     The Company is not a party to, is not bound by, and does not have any obligation under any tax sharing, tax indemnity, or similar agreement.

(f)     The Company has not made and will not make a change in method of accounting for a taxable year beginning on or before the Closing Date, which would require it to include any adjustment under Section 481(a) of the Internal Revenue Code in taxable income for any taxable year beginning on or after the Closing Date.

(g)     Shareholder is not a foreign person so that Section 897 and 6039C of the Internal Revenue Code are not applicable to the transactions provided for hereunder.

(h)     The Company, since its inception, has been a qualified "S Corporation" as that term is defined in the Internal Revenue Code, and has never revoked or terminated such election, no has it taken any action which would threaten, jeopardize or disqualify the Company from its S Corporation status.  In accordance with the Section 338(h)(10) election, the Company's final "S Corporation" return shall report any gain or loss from the deemed sale under Section 338.

For purposes of this Agreement, "tax" and "taxes" shall include all income, gross receipts, franchise, excise, transfer, severance, value added, ad valorum, sales, use, wage, payroll, workmen's compensation, employment, occupation, and real and personal property taxes; taxes measured by or imposed on capital; levies, imposts, duties, license and legislation fees; other taxes imposed by a federal, state, municipal, local, foreign or other governmental authority or agency, including assessments in the nature of taxes; including without limitation, interest, penalties, fines, assessments and deficiencies relating to any tax or taxes; and including transferee or secondary liability for taxes and any taxes due as a result of being a member of any affiliated, consolidated, combined or unitary group or any liability in respect of taxes under a tax sharing, tax allocation, tax indemnity or other agreement.

For purposes of this Agreement, "tax return" or "tax returns" shall mean all returns, reports, estimates, schedules, declarations, information statements and documents relating to or required to be filed in connection with any taxes pursuant to the statutes, rules or regulations of any federal, state, local or foreign government taxing authority.

3.13    Litigation.

Except as set forth on Schedule 3.13, there are no actions, suits or proceedings at law or in equity, or arbitration proceedings, or claims, demands or investigations, pending or threatened against or involving the Company, or state of facts existing which is reasonably likely to give rise to any such action, suit, proceeding, claim, demand or investigation; there are no proceedings pending or threatened against or involving the Company by or before any governmental board, department, commission, bureau, instrumentality or agency (including but not limited to any federal, state, local or foreign governmental agency or body concerned with control of foreign exchange, energy, environmental protection or pollution control, franchising or other distribution arrangements, antitrust or trade regulation, civil rights, labor or discrimination, wages and hours, safety or health, zoning or land use), or state of facts existing which is reasonably likely to give

-10-

rise to any such proceedings; and the Company is not in violation of any order, ruling, decree or judgment of any court or arbitration tribunal or governmental board, department, commission, bureau, instrumentality or agency.

### 3.14    Leased Real Property.

The Company is the lessee under the real estate leases described on Schedule 3.14 hereto. True, correct and complete copies of said leases and any amendments, extensions and renewals thereof have heretofore been delivered by the Company to Buyer. The Company now enjoys and on the Closing Date will enjoy quiet and undisturbed possession under each of said leases. The Company's interest in each of such leases is free and clear of any mortgages and liens created by the Company, is not subject to any deeds of trust, assignments, subleases or rights of any third parties created by the Company, other than the lessor thereof. To the knowledge of the Shareholder, such leased real estate is free and clear of any zoning or use or building restriction or any pending, proposed or threatened zoning or use or building restriction which would now, or on the Closing Date or thereafter, interfere with the present or any intended use by the Company of any of such leased real estate. Said leases now are, and on the Closing Date will be, valid and binding and in full force and effect, and are not now, and on the Closing Date will not be, in default as to the payment of rent or otherwise. The consummation of the transactions contemplated by this Agreement will not constitute an event of default under any of said leases and the continuation, validity and effectiveness of such leases will not be adversely affected by the transactions contemplated by this Agreement.

### 3.15    Owned Tangible Personal Property.

Schedule 3.15 sets forth a list of the tangible personal property of the Company (the "Tangible Personal Property"). Except as set forth on Schedule 3.15 hereto and except for property disposed of in the ordinary course of business of the Company, the Company has and will have at the Closing all right, title and interest in, and good title to, the Tangible Personal Property free and clear of any claim, lease, pledge, mortgage, security interest, conditional sale agreement or other title retention agreement, restriction, lien or encumbrance of any kind or nature whatsoever. True, complete and correct copies of all leases and licenses relating to the Tangible Personal Property have heretofore been delivered by the Company to Buyer.

### 3.16    Condition of Buildings and Tangible Personal Property.

To the knowledge of the Shareholder, all of the premises occupied, and the items of Tangible Personal Property are in operating condition and repair, comply in all respects with applicable laws, regulations and ordinances, including but not limited to zoning, building and fire codes and are suitable and sufficient for the present conduct of the Company's business. Each item of Tangible Personal Property is adequately covered by one of the insurance policies described in Section 3.27 hereto.

3.17    Accounts and Notes Receivable.

Each of the accounts receivable of the Company referred to on the Financial Statements constitutes a valid claim in the full amount thereof against the debtor charged therewith on the books of the Company to which each such account is payable and has been acquired in the ordinary course of business. Except as set forth in Schedule 3.17, Shareholder is not aware of any reason that each account receivable is not fully collectible to the extent of the face value thereof (less the amount of the allowance for the doubtful accounts reflected on the Interim Financial Statements) no later than ninety (90) days after such account receivable is due. To the best of Shareholder's knowledge, no account debtor has any valid setoff, deduction or defense with respect thereto, and no account debtor has asserted any such setoff, deduction or defense. There are no accounts receivable which arise pursuant to an agreement with the United States Government or any agency or instrumentality thereof.

3.18    Material Contracts.

(a)    Schedule 3.18 contains a list of all of the material contracts of the Company (the "Material Contracts") which shall consist of all contracts, whether oral, written or implied, or other agreements, leases, surety arrangements or other commitments to which the Company is a party, under which the Company may become subject to any obligation or liability, or by which the Company or any of its assets may become bound that satisfy any of the following:

(i)    each arrangement, agreement, contract or understanding that involves performance of services or delivery of goods or materials by the Company in an amount or for a value in excess of $25,000;

(ii)    each arrangement, agreement, contract or understanding that was not entered into in the ordinary course of business and that involves expenditures or receipts by the Company in excess of $25,000;

(iii)    each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other arrangement, agreement, contract or understanding affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements having a value per item or aggregate payments of less than $25,000 and with terms of less than one year);

(iv)    each licensing agreement or other arrangement, agreement, contract or understanding with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the nondisclosure of any intellectual property assets of the Company;

-12-

(v)     each collective bargaining agreement or other arrangement, agreement, contract or understanding with any labor union or other employee representative of a group of employees;

(vi)     each joint venture, partnership, and other arrangement, agreement, contract or understanding (however named) involving a sharing of profits, losses, costs, or liabilities by the Company with any other person;

(vii)     each arrangement, agreement, contract or understanding containing covenants that in any way purport to restrict the business activity of the Company;

(viii)     each arrangement, agreement, contract or understanding providing for payments to or by any person based on sales, purchases, or profits, other than direct payments for goods;

(ix)     each power of attorney that is currently effective and outstanding;

(x)     each arrangement, agreement, contract or understanding for capital expenditures in excess of $25,000;

(xi)     each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Company other than in the ordinary course of business; and

(xiii)     each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)     The Material Contracts constitute all of the material agreements and instruments which are necessary to operate the business as currently conducted by the Company. True, correct and complete copies of each Material Contract described and listed under subsection 3.18(a) have been made available to Buyer prior to the date hereof. The term "Material Contract" excludes purchase orders entered into in the ordinary course for personality or inventory which may be returned to the vendor without penalty. All of the Material Contracts are valid, binding and enforceable against the respective parties thereto in accordance with their respective terms. Neither the Company and, to the best of the Shareholder's knowledge, nor any other party, is in default or in arrears under the terms thereof, and no condition exists or event has occurred which, with the giving of notice or lapse of time or both, would constitute a default thereunder.

3.19     Inventories .

All of the Company's inventories are reflected in the Financial Statements at cost or market, whichever is lower; now are and on the Closing Date will be good and salable or usable in the ordinary course of the business of the Company; now are and on the Closing Date will be of sufficient quality for the normal operation of the Company's business; did not on the date of the

Interim Financial Statements contain, do not now contain, and on the Closing Date will not contain, any obsolete items.

3.20    Purchase Commitments and Bids.

All accepted and unfulfilled orders for the sale of merchandise or services entered into by the Company in the operation of its business, and the aggregate of all commitments for the purchase of merchandise or supplies by the Company were made in the ordinary course of the operations of the Company. There are no claims against the Company or the Shareholder to return merchandise by reason of alleged overshipments, defective merchandise or otherwise, or of merchandise in the hands of customers under an understanding that such merchandise would be returnable. Each outstanding bid, proposal, commitment or unfulfilled order which relates to the operations of the Company was priced upon terms consistent with the Company's past practices.

3.21    Intentionally Omitted.

3.22    Banking and Personnel Matters.

Schedule 3.22 hereto contains a true, complete and correct list of: (i) the names of all banks and other financial institutions (with account numbers) in which the Company has an account or safe deposit box, and of all brokerage firms and other entities and persons holding funds or investments of the Company, and the names of all persons authorized to draw thereon or have access thereto; (ii) the names of all incumbent directors and officers of the Company; (iii) the names and job designations, descriptions and locations of all employees, consultants and agents of the Company, the current remuneration of each.,

3.23    Labor and Employment Matters.

(a)    Schedule 3.23 contains a complete list of all employment arrangements , all pension, retirement, profit sharing and bonus plans, and all deferred compensation, health, welfare, all severance management, and other similar plans for the benefit of any employees of the Company, including employee plans ("Employee Benefit Plan"). subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA")). The Company at present is not, and during the five (5) year period preceding the Closing Date, has not been a sponsor of, party to or obligated to contribute to any employee benefit plan (as defined in § 3(3) of ERISA), and has not been a party to any collective bargaining agreement currently in effect or in effect during the five-year period preceding the Closing Date, except as set forth on Schedule 3.23 hereto. The Company has never been a member of a "controlled group of corporations" within the meaning of Internal Revenue Code Section 414(b) or (c) is or has ever maintained a defined benefit pension plan or contributed to a multiemployer plan as defined in Section 3(37) of ERISA. True, correct and complete copies of each Employee Benefit Plan has heretofore been delivered by the Company to Buyer.

(b)    With respect to each Employee Benefit Plan,

-14-

(1)    there is no litigation, disputed claim (other than routine claims for benefits), governmental proceeding, inquiry or investigation pending or threatened with respect to each such Plan, its related trust, or any fiduciary, administrator or sponsor of such Plan;

(2)    each such Plan has been established, maintained, funded and administered in all material respects in accordance with its governing documents, and any applicable provisions of ERISA, the Internal Revenue Code, other applicable law, and all regulations promulgated thereunder.

(c)    Except as disclosed on Schedule 3.23, the Company is not obligated to and does not (directly or indirectly) provide death benefits or health care coverage to any former employees or retirees.

(d)    The Company has complied with all applicable provisions of the Immigration Reform and Control Act of 1986.

3.24    Termination of Business Relationships.

No supplier of the Company which cannot be replaced on commercially reasonable terms has evidenced to the Company any intention to cancel or terminate its business relationship with the Company.  No key employee of the Company has notified the Company or Shareholder of his/her intent or desire to terminate employment with the Company.

3.25    Customers.

Set forth on Schedule 3.25 is a list of the five largest customers the Company based on the percentage of revenue represented by those customers for the fiscal year ended December 31, 1997.  The relationship of the Company with its suppliers and customers are good commercial working relationships, and after due inquiry, no supplier or customer of the Company has canceled, curtailed or otherwise terminated or threatened to cancel or otherwise terminate, his or its relationship with the Company, except that the mix of the Company's customers changes from time to time in the ordinary course of the Company's business.

3.26    Product Warranties.

Except as set forth on Schedule 3.26, there are no liabilities of or claims against the Company or the Shareholder, and no liabilities or claims are threatened against the Company or the Shareholder, with respect to any product liability (or similar claim) or product warranty (or similar claim) claim that relates to any product manufactured or sold by the Company or the Shareholder in the operations of the Company, except for standard warranty and maintenance obligations made in the ordinary course of the operations of the Company to purchasers of its products and services

3.27    Insurance.

Schedule 3.27 sets forth a list of all the Company's insurance policies. The Company maintains insurance covering its assets, business, equipment, properties, operations and employees with such coverage, in such amounts, and with such deductibles and premiums as are consistent with insurance coverage provided for other companies of comparable size and in comparable industries. All of such policies are in full force and effect and all premiums payable have been paid in full and the Company is in full compliance with the terms and conditions of such policies. The Company has not received any notice from any issuer of such policies of its intention to cancel or refusal to renew any policy issued by it or of its intention to renew any such policy based on a material increase in premium rates other than in the ordinary course of business. None of such policies are subject to cancellation by virtue of the Agreement or the consummation of the other transactions contemplated herein. There is no claim by the Company pending under any of such policies as to which coverage has been questioned or denied.

3.28    Compliance with Laws.

The Company has complied in all material respects with all applicable laws, statutes, rules and regulations, orders of federal, state, local and foreign governments and governmental agencies applicable to it and its business, assets, properties and operations and no claim of any such laws or regulations exists on the date hereof.

3.29    Licenses and Permits.

The Company has secured all licenses, franchises, permits and other authorizations from federal, state, local and other governmental or administrative authorities (an "Authority") applicable to its assets, properties and operations or necessary for the conduct of its business (the "Permits"), except for any of the foregoing, the absence of which, either alone or in the aggregate, would not have a material adverse effect upon the business or financial condition of the Company. Except as set forth in Schedule 3.29, (a) each of said Permits is in full force and effect, (b) the Company (or other designated permittee or licensee thereunder) is in compliance with the terms, provisions and conditions thereof, (c) there are no outstanding violations, notices of noncompliance therewith, judgments, consent decrees, orders or judicial or administrative action(s) or proceedings(s) affecting any of said Permits and (d) no condition exists and no event has occurred which (whether with or without notice, lapse of time or the occurrence of any other event) would permit the suspension or revocation of any of said permits other than by expiration of the term set forth therein. To the knowledge of the Shareholder, consummation of the transactions contemplated by this Agreement will not affect the validity, enforceability or effectiveness of any such Permit and no filing with or consent authorization or approval of any Authority is required in connection with the consummation of the transactions contemplated hereby.

3.30    No Interest in Suppliers.

Neither the Company nor the Shareholder has any direct or indirect equity interest in, or power to control the business or affairs of, or intention to acquire such interest in or control of, any person that is a manufacturer, supplier, lender, lessor or provider of services or equipment to the Company.

3.31    All Business Conducted by the Company.

The business and operations of the Company are conducted exclusively by the Company, and not by the Shareholder or any other business entity whether or not affiliated with the Company.

3.32    Environmental Matters.

Except as set forth on Schedule 3.32 hereto, (i) the Company is currently in compliance with all applicable Environmental Laws, and has obtained all permits and other authorizations from, and submitted all forms, fees, registrations, reports and similar filings to, the appropriate person or governmental agency needed, or required, to operate its facilities in compliance with the applicable Environmental Laws; (ii) the Company has not violated any applicable Environmental Law; (iii) the Shareholder is unaware of any present requirement of any applicable Environmental Law which is due to be imposed upon it which will increase its cost of complying with the Environmental Laws; (iv) all past on-site generation, treatment, processing, storage and disposal of Waste, including Hazardous Waste, by the Company and its predecessors have been done in compliance with the currently applicable Environmental Laws; (v) all past off-site transportation, treatment, processing, storage and disposal of Waste, including Hazardous Waste, generated by the Company and its predecessors have been done in compliance with the currently applicable Environmental Laws; (vi) the Company and its predecessors have not released, spilled, leaked or otherwise discharged into the environment any Regulated Substance except as expressly authorized by the applicable Environmental Laws; and (vii) the Company and its predecessors have not used or otherwise managed any Regulated Substance except in strict compliance with all applicable Environmental Laws.

As used in this Agreement, the terms (i) "Environmental Laws" include but are not limited to any federal, state, foreign or local law, statute, charter or ordinance, and any rule, regulation, binding interpretation, binding policy, permit, order, court order or consent decree issued pursuant to any of the foregoing, which pertains to, governs or otherwise regulates any of the following activities: (a) the emission, discharge, release or spilling of any Regulated Substance into the air, surface water, groundwater, soil or substrata and (b) the manufacturing, processing, sale, generation, treatment, transportation, storage, disposal, labeling or other management of any Waste, including any Hazardous Waste or Regulated Substance; (ii) "Waste" and "Hazardous Waste" include any substance defined as such by any applicable Environmental Law; and (iii) "Regulated Substances" include any substance the manufacturing, processing, sale, generation, treatment, transportation, storage, disposal, labeling or other management or use of which is regulated by any applicable Environmental Law.

3.33    Intellectual Property Matters.

(a)    The corporate name of the Company and the trade names and service marks listed on Schedule 3.33 are the only names and service marks which are used by the Company in the operation of its business (the "Names and Service Marks"). The Company owns, or has enforceable rights to use all intellectual property presently in use by it and necessary for the operation of its business as now being conducted, which intellectual property includes, but is not limited to, patents, trademarks, trade names, service marks, copyrights, trade secrets, customer lists, inventions, formulas, methods, processes and other proprietary information (the "Intellectual Property"). There are no outstanding licenses or consents granting third parties the right to use the Intellectual Property owned by the Company. The Company has received no notice of any adversely held patent, invention, trademark, copyright, service mark or tradename of any person, or any claims of any other person relating to any of the Intellectual Property subject hereto. There is no presently known threatened use or encroachment of any such intellectual property. To the knowledge of the Shareholder, the manufacture, sale or use of any products now or heretofore manufactured or sold by the Company did not and does not infringe (nor has any claim been made that any such action infringes) the intellectual property rights of others.

(b)    To the knowledge of Shareholder, all Intellectual Property of the Company is Millennium Compliant. "Millennium Compliant" shall mean the ability of software to provide all of the following functions: (a) consistently handle date information before, during, and after January 1, 2000, including but not limited to accepting date input, providing date output, and performing calculations on dates or portions of dates; (b) function accurately, in accordance with the published documentation, and without interruption before, during, and after January 1, 2000, without any change in operations associated with the advent of the new century; (c) respond to two-digit year-date input in a way that resolves any ambiguity as to century in a disclosed, defined, and predetermined manner; and (d) store and provide output of date information in ways that are unambiguous as to century.

3.34    Investment Intent.

(a)    Except with respect to the registration rights granted to the Shareholder pursuant to the terms of the Registration Rights Agreement, the shares included in the Stock Consideration are not being registered under the Act on the basis of the statutory exemption provided by Section 4(2) thereof, relating to transactions not involving a public offering, and the Buyer's reliance on the statutory exemption thereof is based in part on the representations contained in this Agreement.

(b)    The Shareholder represents (i) that he has, or as of the Closing, will have reviewed such quarterly, annual and periodic reports of the Buyer as have been filed with the Securities and Exchange Commission since December 22, 1997 (the "Reports") and that he has such knowledge and experience in financial and business matters that he is capable of utilizing the information set forth therein, concerning Buyer to evaluate the risk of investing in the Buyer; (ii) that he has been advised that the Stock Consideration to be issued to him by the Buyer will not be registered under the Act, except as otherwise provided in this Agreement, and accordingly,

-18-

the Shareholder may only be able to sell or otherwise dispose of such shares in accordance with Rule 144, an applicable exemption from registration under the Act, or except as otherwise provided in this Agreement; (iii) that the Osage Stock will be held for investment and not with a view to, or for resale in connection with the public offering or distribution thereof; (iv) that the Osage Stock so issued will not be sold without registration thereof under the Act (unless such shares are subject to registration or in the opinion of counsel to the Buyer an exemption from such registration is available, and in the event that counsel for the Buyer does not provide such opinion to Shareholder within ten (10) days of Shareholder's request, Shareholder may engage counsel experienced in matters governed by the Act and in the reasonable opinion of the Company is qualified to render such opinion), or in violation of any law; and (v) that the certificate or certificates representing the Osage Stock to be issued will be imprinted with a legend in form and substance substantially as follows:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"). THESE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF REGISTRATION, OR THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION, UNDER THE SECURITIES ACT OF 1933, AS AMENDED, BASED ON AN OPINION LETTER OF COUNSEL FOR THE COMPANY (IN THE EVENT THAT COUNSEL FOR THE COMPANY DOES NOT PROVIDE SUCH OPINION TO SHAREHOLDER WITHIN TEN (10) DAYS OF SHAREHOLDER'S REQUEST, SHAREHOLDER MAY ENGAGE COUNSEL EXPERIENCED IN MATTERS GOVERNED BY THE ACT AND IN THE REASONABLE OPINION OF THE COMPANY IS QUALIFIED TO RENDER SUCH OPINION) OR A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.

and Buyer is hereby authorized to notify its transfer agent of the status of the Stock Consideration to place a "stop-transfer" order on the transfer agent's books and records to assure compliance with the Act.

(c)    The Shareholder has either upon the date hereof or before the Closing hereunder, been afforded the opportunity to review and is familiar with the Reports and has based his decision to invest solely on the information contained therein, and the information contained within this Agreement and the associated exhibits and schedules, and has not been furnished with any other literature, prospectus or other information except as included in the Reports or this Agreement.

(d)    Shareholder has been given the opportunity to ask questions about the Company and is satisfied that any information about the Buyer and Osage Stock have been answered to Shareholder's satisfaction.

(e)    The Shareholder is able to bear the economic risks of an investment in the Stock Consideration and warrants that his overall commitment to his investments which are not readily marketable is not disproportionate to his net worth.

(f)    The Shareholder understands that no federal or state agency has approved or disapproved the Stock Consideration, passed upon or endorsed the merits of the transfer of such shares set forth within this Agreement or made any finding or determination as to the fairness of such shares for investment.

3.35    Disclosure.

Neither this Agreement nor any other document, certificate, exhibit, statement or schedule furnished or to be furnished by or on behalf of the Company to Buyer in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the factual statements contained therein, in light of the circumstances under which made, not misleading.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to the Shareholder to execute this Agreement and to consummate the transactions contemplated hereby, Buyer hereby makes the following representations and warranties to the Shareholder.

4.1    Organization and Qualification.

Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has the corporate power and authority to carry on its business as presently conducted.  Buyer is duly qualified or licensed to do business and in good standing as a foreign corporation in each of the jurisdictions in which the nature of its business or the character of the properties and assets which it owns or leases makes such qualification or licensing necessary.

4.2    Corporate Instruments and Records.

The copies of the Buyer's certificate of incorporation and bylaws, each certified by the Secretary of the Buyer and heretofore furnished to Shareholder, are true, correct and complete and each include all amendments to the date hereof.  The Buyer's minute books, as made available to Shareholder, contain a true, complete and correct record of all corporate action taken on or prior to the date hereof at the meetings of its shareholders and directors and committees thereof.

4.3    Authorization; Valid and Binding Obligation.

Buyer has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by Buyer and constitutes, and the other documents to be executed and delivered pursuant hereto when executed and delivered by Buyer will constitute, the legal, valid and binding obligations of

Buyer, enforceable against it in accordance with its terms. The execution, delivery and performance of this Agreement and the other agreements of the Buyer contemplated hereby (collectively, the "Buyer's Agreements") do not require the consent of or notice to any third-party. Neither the execution and delivery of the Buyer's Agreements nor the consummation of the transactions contemplated thereby will conflict with or result in any violation of or constitute a default under any term of the certificate of incorporation or bylaws of the Buyer, or any agreement, mortgage, debt instrument, indenture, or other instrument, judgment, decree, order, award, law or regulation by which the Buyer is bound, or result in the creation of any lien, security interest, charge or encumbrance upon any of the assets of the Buyer, or result in the cancellation, modification, revocation or suspension of any license, certificate, permit or authorization held by the Buyer.

       4.4     Litigation.

Except as set forth on Schedule 4.4, there are no actions, suits or proceedings at law or in equity, or arbitration proceedings, or claims, demands or investigations, pending or threatened against or involving the Buyer, or state of facts existing which could give rise to any such action, suit, proceeding, claim, demand or investigation; there are no proceedings pending or threatened against or involving the Buyer by or before any governmental board, department, commission, bureau, instrumentality or agency (including but not limited to any federal, state, local or foreign governmental agency or body concerned with control of foreign exchange, energy, environmental protection or pollution control, franchising or other distribution arrangements, antitrust or trade regulation, civil rights, labor or discrimination, wages and hours, safety or health, zoning or land use), or state of facts existing which could give rise to any such proceedings; and the Buyer is not in violation of any order, ruling, decree or judgment of any court or arbitration tribunal or governmental board, department, commission, bureau, instrumentality or agency.

       4.5     Stock Consideration.

Shares to be issued as Stock Consideration pursuant to this Agreement will be, upon issuance, duly authorized, validly issued, fully paid and non-assessable with no liability on the part of the holders thereof.

       4.6     Capitalization.

       (a)     As of the date hereof, the outstanding capital stock of the Buyer consists solely of shares of: (A) 6,270,000 shares of Buyer's common stock par value $0.01 per share (the "Common Stock"); (B) 122 shares of Series A Preferred Stock; (C) 50 shares of Series B $3.00 Convertible Preferred Stock; (D) 105.3 shares of Series C $3.00 Convertible Preferred Stock; and (E) Options to purchase 1,300,000 shares of the Common Stock. All outstanding shares of capital stock of Buyer have been duly authorized and validly issued and are fully paid and nonassessable and free of preemptive rights. Except as otherwise set forth herein, within the Buyer's SEC Reports or on Schedule 4.6, there are no outstanding or presently authorized warrants, preemptive rights, subscription rights, options or related commitments or agreements of

any nature to issue any of Buyer's securities or to sell, pledge, assign or otherwise transfer such securities.

(b)    Buyer has a sufficient number of its authorized but unissued shares of Common Stock to permit it to issue the Stock Consideration due in connection with the Agreement, assuming trading prices of Buyer's Common Stock remain at current levels, as well as all of Buyer's other obligations to issue shares of its Common Stock upon exercise of any option, warrant or other right to acquire the same, based upon the same assumption.

4.7    SEC Reports.

Buyer has heretofore delivered to Shareholder copies of its Annual Report on Form 10-KSB for the year ended December 31, 1997, and all Current Reports on Form 8-K since December 22, 1997 (the "Buyer's SEC Reports"). As of their date of filing, the Buyer's SEC Reports did not contain any untrue statements of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. Furthermore, except as otherwise disclosed in Buyer's SEC Reports, Buyer has experienced no material adverse change in its financial condition, properties, business or prospects since the date thereof. The Buyer's SEC Reports have been prepared in compliance with all applicable securities laws, rules and regulations, and the financial statements included therein had been prepared in accordance with general accepted accounting principles, consistently applied, and fairly presented the financial condition of Buyer as of the date and for the periods covered thereby.

4.8    No Violations.

The Buyer is not in default under or in violation of any provision of (a) its certificate of incorporation or bylaws, or (b) any agreement, understanding, arrangement, indenture, contract, lease, sublease, loan agreement, note, restriction, obligation or liability to which it is a party or by which it is bound or to which it or its assets are subject (individually, an "Instrument" and collectively, the "Instruments"). Neither the execution and delivery of this Agreement by the Buyer, nor the consummation of the transactions contemplated hereby or thereby, nor compliance with the terms hereof or thereof, will (i) conflict with or result in a breach of any of the terms, conditions or provisions of the certificate of incorporation or bylaws of the Buyer, nor (ii) violate, conflict with or result in a breach of or default under any of the terms, conditions or provisions of any Instrument, nor (iii) accelerate or give to others any interests or rights, including rights of acceleration, termination, modification or cancellation, under any Instrument or in or with respect to the business or assets of the Buyer, nor (iv) result in the creation of any lien, claim, charge or encumbrance on the assets, capital stock or properties of the Buyer, nor (v) conflict with, violate or result in a breach of or constitute a default under any law, statute, rule, judgment, order, decree, injunction, ruling or regulation of any government, governmental agency, authority or instrumentality, court or arbitration tribunal to which the Buyer or any of its assets or properties is subject, nor (vi) require the Buyer to give notice to, or obtain an authorization, approval, order, license, franchise, declaration or consent of, or make a filing with, any foreign, federal, state, county, local or other governmental or regulatory body or other person, other than any filings

-22-

required to be made with the Federal Trade Commission ("FTC") and Antitrust Division of the Department of Justice ("Justice Department") of Notification and Report Forms pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act") and the rules promulgated thereunder.

4.9    Undisclosed Liabilities:

Except as otherwise disclosed in this Agreement or any Schedules thereto, Buyer does not have any liabilities or obligations of any nature, fixed or contingent, that will not be shown or otherwise provided for in the Buyer SEC Reports, except for liabilities and obligations arising subsequent to the date of such Buyer's SEC Reports in the ordinary course of business, none of which individually or in the aggregate will be materially adverse to the business or financial condition of Buyer. There are no material loss contingencies (as such term is used in Statement of Financial Accounting Standards No. 5 of the Financial Accounting Standards Board) of Buyer that will not be adequately provided for.

4.10    Disclosure.

No representation or warranty of Buyer in this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the factual statements contained herein, in light of the circumstances under which such statements are made, not misleading.

4.11    No Adverse Changes.

Since the date of the most recent Buyer's SEC Reports to the date of this Agreement, the business of the Buyer has been operated in the ordinary course and there has not been any materially adverse change in the business, condition (financial or otherwise), results of operations, properties, assets, liabilities, earnings or net worth of Buyer.

4.12    Investment Intent.

(a)    The Buyer represents (i) that it has, or as of the Closing, will have such knowledge and experience in financial and business matters that he is capable of evaluating the risk of purchasing the Shares; (ii) that it has been advised that the Shares purchased by it will not be registered under the Act, except as otherwise provided in this Agreement; and (iii) that the Shares will be held for investment and not with a view to, or for resale in connection with the public offering or distribution thereof.

## ARTICLE V
## AGREEMENTS OF THE PARTIES

5.1    Access to Information.

At all times prior to the Closing or the earlier termination of this Agreement in accordance with the provisions of Article 8, and in each case subject to Section 5.2 below, each of the parties hereto shall provide to the other parties (and the other parties' authorized representatives) full access during normal business hours and upon reasonable prior notice to the premises, properties, books, records, assets, liabilities, operations, contracts, personnel, financial information and other data and information of or relating to such party (including without limitation all written proprietary and trade secret information and documents, and other written information and documents relating to intellectual property rights and matters), and will cooperate with the other party in conducting its due diligence investigation of such party.

5.2    Confidentiality; No Solicitation.

(a)    With respect to information concerning the Company that is made available to Buyer pursuant to the terms of this Agreement, Buyer agrees that it shall hold such information in strict confidence, shall not use such information except for the sole purpose of evaluating the Agreement and related transactions and shall not disseminate or disclose any of such information other than to its directors, officers, employees, shareholders, affiliates, agents and representatives who need to know such information for the sole purpose of evaluating the Agreement and the related transactions (each of whom shall be informed in writing by Buyer of the confidential nature of such information and directed by Buyer in writing to treat such information confidentially). If this Agreement is terminated pursuant to the provisions of Section 8, Buyer shall immediately return all such information, all copies thereof and all information prepared by Buyer based upon the same; provided, however, that one copy of all such material may be retained by Buyer's outside legal counsel for purposes only of resolving any disputes under this Agreement. The above limitations on use, dissemination and disclosure shall not apply to information that (i) is learned by Buyer from a third party entitled to disclose it; (ii) becomes known publicly other than through Buyer or any party who received the same through Buyer, provided that Buyer has no knowledge that the disclosing party was subject to an obligation of confidentiality; (iii) is required by law or court order to be disclosed by Buyer; or (iv) is disclosed with the express prior written consent thereto of the Shareholder. Buyer shall undertake all necessary steps to ensure that the secrecy and confidentiality of such information will be maintained in accordance with the provisions of this paragraph (a). Notwithstanding anything contained herein to the contrary, in the event a party is required by court order or subpoena to disclose information which is otherwise deemed to be confidential or subject to the confidentiality obligations hereunder, prior to such disclosure, the disclosing party shall: (i) promptly notify the non-disclosing party and, if having received a court order or subpoena, deliver a copy of the same to the non-disclosing party; (ii) cooperate with the non-disclosing party, at the expense of the non-disclosing party in, obtaining a protective or similar order with respect to such information; and (iii) provide only such of the confidential information as the disclosing party is advised by its counsel is necessary to strictly comply with such court order or subpoena.

-24-

(b)     With respect to information concerning Buyer that is made available to the Shareholder pursuant to the provisions of this Agreement, the Shareholder agrees that he shall hold such information in strict confidence, shall not use such information except for the sole purpose of evaluating the Agreement and the related transactions, and shall not disseminate or disclose any of such information other than to the Company's directors, officers, employees, affiliates, agents and representatives who need to know such information for the sole purpose of evaluating the Agreement and the related transactions (each of whom shall be informed in writing by the Shareholder of the confidential nature of such information and directed by such party in writing to treat such information confidentially). If this Agreement is terminated pursuant to the provisions of Section 8, the Shareholder agrees to return immediately all such information, all copies thereof and all information prepared by either of Shareholder or the Company based upon the same; provided, however, that one copy of all such material may be retained by the Shareholder's legal counsel for purposes only of resolving any disputes under this Agreement. The above limitations on use, dissemination and disclosure shall not apply to information that (i) is learned by the Shareholder from a third party entitled to disclose it; (ii) becomes known publicly other than through the Shareholder or any party who received the same through the Shareholder, provided that the Shareholder has no knowledge that the disclosing party was subject to an obligation of confidentiality; (iii) is required by law or court order to be disclosed by the Shareholder; or (iv) is disclosed with the express prior written consent thereto of Buyer. The Shareholder agrees to undertake all necessary steps to ensure that the secrecy and confidentiality of such information will be maintained in accordance with the provisions of this paragraph (b). Notwithstanding any thing contained herein to the contrary, in the event a party is required by court order or subpoena to disclose information which is otherwise deemed to be confidential or subject to the confidentiality obligations hereunder, prior to such disclosure, the disclosing party shall: (i) promptly notify the non-disclosing party and, if having received a court order or subpoena, deliver a copy of the same to the non-disclosing party; (ii) cooperate with the non-disclosing party at the expense of the non-disclosing party in obtaining a protective or similar order with respect to such information; and (iii) provide only such of the confidential information as the disclosing party is advised by its counsel is necessary to strictly comply with such court order or subpoena.

5.3     Interim Operations.

During the period from the date of this Agreement and continuing until the Closing:

(a)     The Shareholder agrees (except as expressly contemplated by this Agreement, including any Exhibits and Schedules hereto, or to the extent that Buyer shall otherwise consent in writing) that as to the Company:

(1)     The Company shall carry on its business in the usual, regular and ordinary course in substantially the same manner as heretofore conducted and, to the extent consistent with such business, use all reasonable efforts to preserve intact its present business organization, keep available the services of its present officers and employees and preserve its relationships with customers, suppliers and others having business dealings with it;

-25-

(2)    The Company shall not and shall not propose to: (a) declare, set aside or pay any dividend, on, or make other distributions in respect of, any of its capital stock, or purchase or redeem any shares of its capital stock other than a cash dividend to be distributed to the Shareholder in an amount equal to the Shareholder's liability for federal and state taxes on the earnings from operations of the Company during 1998 through the Closing Date (exclusive of any income or gain on sale associated with the transactions covered by this Agreement) as more fully described at Section 5.4 hereafter; (b) split, combine or reclassify any of its capital stock or issue, authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock; (c) redeem, repurchase or otherwise acquire any shares of its capital stock; or (d) otherwise change its capitalization.

(3)    Except as contemplated by this Agreement, the Company shall not sell, issue, pledge, authorize or propose the sale or issuance of, pledge or purchase or propose the purchase of, any shares of its capital stock of any class or securities convertible into, or rights, warrants or options to acquire, any such shares or other convertible securities.

(4)    The Company shall not amend its certificate of incorporation or its Bylaws.

(5)    The Company shall not sell, lease, pledge, encumber or otherwise dispose of or agree to sell, lease, pledge, encumber or otherwise dispose of, any of its assets that are material or any other assets except in the ordinary course of business consistent with prior practice and in no event amounting in the aggregate to more than $25,000.

(6)    The Company shall not incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities of the Company or guarantee any debt securities of others other than in the ordinary course of business consistent with prior practice and in no event amounting in the aggregate to more than $25,000.

(7)    The Company shall not adopt or amend in any material respect any collective bargaining agreement or Employee Benefit Plan.

(8)    The Company shall not grant to any executive officer any increase in compensation or in severance or termination pay, or enter into any employment agreement with any executive officer.

(9)    The Company shall not acquire (by merger, consolidation or acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or subdivision thereof, or make any investment by either purchase of stock or securities, contributions to capital , property transfer or, except in the ordinary course of business, purchase of any property or assets, of any other individual or entity.

(10)    The Company shall not make any material tax election or settle or compromise any material federal, state, local or foreign tax liability.

(11)    The Company shall not waive, release, grant or transfer any rights of material value or modify or change in any material respect any Material Contract other than in the ordinary course of business and consistent with past practice.

(12)    The Company shall not enter into any agreement or arrangement to do any of the foregoing. The Company shall not take any action, or fail to take any action, that is reasonably likely to result in any of the representations and warranties of the Company set forth in this Agreement becoming untrue in any material respect.

(b)    Buyer agrees (except as expressly contemplated by this Agreement, including any Exhibits and Schedules hereto, or to the extent that the Shareholder shall otherwise consent in writing or to the extent required to permit Buyer to meet its obligations under this Section 5) that:

(1)    Buyer shall carry on its business in the usual, regular and ordinary course in substantially the same manner as heretofore conducted and, to the extent consistent with such business, use all reasonable efforts to preserve intact its present business organization (provided that such obligation shall not relate to the officers and employees of Buyer or any of its subsidiaries) and preserve its relationships with customers, suppliers and others having business dealings with it.

(2)    As part of its overall business strategy, Buyer is presently in negotiations with other companies that may be suitable acquisition targets. Buyer may, therefore, make one or more acquisitions prior to the Closing, and in connection therewith, may be caused to issue additional securities, of whatever nature and number, in connection with such acquisitions. In addition, Buyer may also be caused to issue additional securities, of whatever nature and number, in connection with certain private placement transactions which may be undertaken between the date hereof and the Closing.

(3)    Buyer shall not (and shall not propose to) (a) declare or pay any dividend, on, or make other distributions in respect of, any of its capital stock, (b) split, combine or reclassify any of its capital stock or issue, authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock, (c) repurchase or otherwise acquire any shares of its capital stock or (d) otherwise change its capitalization.

(4)    Buyer shall not sell, lease, pledge, encumber or otherwise dispose of, or agree to sell, lease, pledge, encumber or otherwise dispose of, any of its assets that are material, or any other assets except in the ordinary course of business consistent with prior practice.

(5)    Buyer shall not adopt or amend in any material respect any collective bargaining agreement or Employee Benefit Plan (as defined herein).

(6)    Buyer shall not enter into any agreement or arrangement to do any of the foregoing. Buyer shall not take any action, or fail to take any action, that is reasonably

likely to result in any of their representations and warranties set forth in this Agreement becoming untrue in any material respect.

5.4    Permissible Distributions to Shareholder.

In recognition of the Company's status as an S Corporation, Buyer has agreed to permit the Shareholder to withdraw from the Company funds to assist the Shareholder in the payment of Shareholder's federal and state income tax liability for the taxable earnings of the Company from January 1, 1998 through the Closing Date, exclusive of any income or gains resulting from the Section 338(h)(10) election, to the extent such distributions have not already been withdrawn by the Shareholder. Pursuant to that end, the Shareholder may withdraw, in total, funds from the Company in an amount equal to the Company's taxable income earned through the Closing Date, exclusive of any income or gains resulting from the Section 338(h)(10) election, multiplied by the Shareholder's tax bracket historically associated with the Company's earnings from operations. As of the date of this Agreement, the Company has paid the Shareholder a cash dividend of $56,357 on April 16, 1998 for purposes of satisfying the Shareholder's April 15, 1998 estimated tax obligation relating to federal income on earnings of the Company for tax year 1998. All amounts not previously distributed to the Shareholder to cover the taxes described herein, shall be distributed to the Shareholder once all parties are satisfied as to the determination of such amounts, however, in no event later than the due date of the final S-Corporation tax return for the taxable period January 1, 1998 through the Closing Date . In the event that the amounts withdrawn by the Shareholder on or before the Closing Date exceed the amounts the Shareholder is entitled to withdraw under this section after notice from the Buyer, the Shareholder shall have an obligation to refund to the Company, any and all such excess distributions within thirty (30) days thereafter, and in the absence thereof, the Buyer may setoff such excess amounts against any and all other amounts due to the Shareholder hereunder, including an offset against the Escrow Fund to the extent of shares of Buyer's Common Stock valued at 50% of the per share price utilized in connection with computing the Closing Value.

5.5    Consents.

Buyer understands that the consents listed on Schedule 5.5 have not been obtained prior to the Closing, and Buyer agrees to bear the risk of loss or damage to the business of the Company, if any, that may result from the failure to obtain such consents. Buyer acknowledges that the Shareholder was willing to delay entering into this Agreement or the holding of the Closing for the purpose of allowing him to have time to solicit and obtain such consents, and that Buyer determined, for its own reasons, to consummate the transactions contemplated in this Agreement, without such consents having been obtained. After the Closing, the Shareholder will cooperate with the Company and Buyer in its efforts to obtain such consents, but Buyer agrees that the obtaining of such consents shall be the responsibility of the Buyer and the Company.

5.6    Filings.

Buyer and the Shareholder shall, as promptly as practicable, make any required filing, and any other required submissions, under any law, statute, order rule or regulation with respect to the

-28-

Agreement and the related transactions and shall cooperate with each other with respect to the foregoing. After the Closing, Buyer shall timely file a current report on Form 8-K relating to the Agreement and the transactions contemplated hereby.

### 5.7    All Reasonable Efforts.

Subject to the terms and conditions of this Agreement and to the fiduciary duties and obligations of the boards of directors of the parties hereto to their respective shareholders, as advised by their counsel, each of the parties to this Agreement shall use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations, or to remove any injunctions or other impediments or delays, legal or otherwise, as soon as reasonable practicable, to consummate the transactions contemplated by this Agreement.

### 5.8    Public Announcements.

Neither the Shareholder nor the Buyer shall disclose to the public or to any third party the existence of this Agreement or the transactions contemplated hereby or any other material non-public information concerning or relating to the other party hereto, other than with the express prior written consent of the other party hereto, except as may be required by law or court order or to enforce the rights of such disclosing party under this Agreement, in which event the contents of any proposed disclosure shall be discussed with the other party before release; provided, however, that notwithstanding anything to the contrary contained in this Agreement, any party hereto may disclose this Agreement to any of its directors, officers, employees, shareholders, affiliates, agents and representative who need to know such information for the sole purpose of evaluating the Agreement, and to any party whose consent is required in connection with this Agreement. The parties anticipate issuing a mutually acceptable, joint press release announcing the execution of this Agreement and the consummation of the transactions provided for herein.

### 5.9    Notification of Certain Matters.

The Shareholder shall give prompt notice to Buyer, and Buyer shall give prompt notice to Shareholder, of (a) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of its representations or warranties in this Agreement to be untrue or inaccurate in any material respect, as to the Company or the Shareholder, at or prior to the Closing, and, as to Buyer, as of the Closing and (b) any material failure of the Shareholder, on the one hand, or Buyer, on the other hand, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by them under this Agreement; provided, however, the delivery of any notice pursuant to this Section shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement as expressly provided in this Agreement.

### 5.10    Documents at Closing.

Each party to this Agreement agrees to execute and deliver at the Closing the Exhibits and other documents identified in Section 2.2.

5.11    Satisfaction of Guarantees.

Buyer agrees to satisfy or assume in full the guarantees of Shareholder identified on Schedule 3.11 hereto and as a result, to have the Shareholder released from such guarantees.

5.12    Prohibition on Trading in Buyer Stock.

The Shareholder acknowledges that the United States securities laws prohibit any person who has received material non-public information concerning the matters which are the subject matter of this Agreement from purchasing or selling the securities of the Buyer, or from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell securities of the Buyer. Accordingly, the Shareholder agrees that he will not purchase or sell any securities of the Buyer, or communicate such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell securities of the Buyer, until no earlier than 72 hours following the dissemination of a Current Report on Form 8-K to the SEC announcing the Closing pursuant to this Agreement provided that the Form 8-K is required and timely filed.

5.13    Establishment of Retention Plan.

Following Closing, the Buyer shall establish a retention plan for the key employees of the Company as of the Closing Date and who are identified upon Schedule 5.13 hereto, who continue in the employment of Buyer for two years from Closing (the "Key Employees"). Within thirty (30) days following the end of the twenty-fourth month following Closing (the "Distribution Date"), Buyer will deliver and the Key Employees shall be entitled to receive bonuses in an aggregate amount of $500,000 (the "Bonus Pool"). The Bonus Pool shall be comprised of $250,000 in cash, and the remaining $250,000 in value shall be comprised of shares of Buyer's Common Stock having a value equal to the lower of: (i) the Closing Value; or (ii) the average closing price of the Buyer's Common Stock (on the principal exchange, market or quotation system upon which such shares regularly trade at the time) for the twenty (20) trading days preceding the end of the twenty-fourth month following Closing. Allocation of the Bonus Pool among the Key Employees shall be agreed upon by Buyer and Shareholder promptly following Closing.

5.14    Tax Matters/Section 338(h)(10) Election.

(a)    The Shareholder will timely and properly file or cause to be filed all tax returns of the Company which are due or which will become due for periods ending through the Closing Date, all such tax returns to be true and correct and complete in all material respects, and the Shareholder will pay or cause to be paid in full when due all taxes, if any, which become due and payable pursuant to such returns, or assessments received by him on or before the Closing Date; in that regard, the Company shall provide Shareholder with such reasonable access to the

books and records of the Company as is necessary to complete and file such tax returns. Shareholder shall present for Buyer's review and Buyer shall be entitled to review all final federal and state S-corporation returns which shall include gains, if any, resulting from the Section 338(h)(10) election to be filed by the parties hereto, thirty (30) days prior to the filing of any such return. In addition, Shareholder agrees that any and all costs of preparing such return shall be borne exclusively by the Shareholder.

       (b)    The Shareholder and Buyer shall jointly make an election on a timely basis with respect to the Company under Section 338(h)(10) of the Internal Revenue Code (the "Code") on Form 8023 or in such other manner as may be required by rule or regulation of the Internal Revenue Service, and shall jointly make an election in the manner required under any analogous provision of state or local law as the Buyer shall designate or as shall be required, concerning the transactions contemplated by this Agreement. The Buyer shall, with the assistance and cooperation of the Shareholder, prepare all such Section 338(h)(10) forms required as attachments to Form 8023 (and all forms under analogous provisions of state or local law) in accordance with applicable tax laws and shall on such Form 8023 allocate the Purchase Price in a manner consistent with Section 338 of the Code, and the Buyer shall deliver such forms and related documents to the Shareholder at least 60 days prior to the due date of filing. The Shareholder shall deliver to the Buyer at least 30 days prior to the due date of filing such completed forms as are required to be filed under Section 338(h)(10) of the Code (and analogous provisions of state or local law). The Shareholder shall not be obligated to indemnify the Buyer or the Company for any amount of Delaware capital stock tax attributable to the Section 338(h)(10) election. The Shareholder and Buyer shall jointly execute any amended Form 8023's (and all forms under analogous provisions of state or local law) as may become necessary after the initial filing to the extent post-closing adjustments to Purchase Price arise under the provisions of this Agreement.

    5.15    Repurchase of Accounts Receivable.

       After the Closing Date, Buyer shall provide Shareholder with written notice in the event that certain of the accounts and notes receivable of the Company as of the Closing Date are not collected in full within ninety (90) days after the Closing Date, less any allowance for doubtful accounts reflected in the Interim Financial Statements. Shareholder shall thereafter have ninety (90) days from the date of such notification to collect in full on behalf of the Company all such outstanding accounts and notes receivable; and to the extent that any such accounts and notes receivable remain outstanding (less the allowance for doubtful accounts reflected in the Interim Financial Statements), Shareholder shall, within ten (10) days thereafter, purchase from the Company, for cash, the face value of all such outstanding accounts and notes receivable.

    5.16    Governmental Authority.

       If so required, the parties shall have filed with the Federal Trade Commission and the Antitrust Division of the Department of Justice notification and report forms with respect to the transactions contemplated hereby pursuant to the HSR Act and the rules promulgated thereunder,

and the waiting period required to expire under the HSR Act and rules, including any extension thereof, shall have expired.

### 5.17    Absence of Broker or Finder.

There is no investment banker, broker, finder or other similar intermediary which has been retained by, or is authorized by, the Shareholder to act on its behalf who might be entitled to any fee or commission from the Buyer or the Company; there is no investment banker, broker, finder or other similar intermediary which has been retained by, or is authorized by, the Buyer to act on its behalf who might be entitled to any fee or commission from the Shareholder or the Company upon consummation of the transactions contemplated by this Agreement.

### 5.18    Cooperation; Further Assurances.

Each party to this Agreement agrees to cooperate fully with the other parties hereto and their counsel and accountants and other representatives, will use best efforts to cause satisfaction of the conditions to consummation of the transactions contemplated herein as promptly as possible, and will refrain from a course of action inconsistent with this Agreement. Each party shall, upon request of any of the other parties hereto, at any time and from time to time execute, acknowledge, deliver and perform all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and instruments of further assurances as may be necessary or appropriate to carry out the provisions and intent of this Agreement.

### 5.19    Further Mutual Covenants.

Buyer and the Shareholder shall refrain from taking any action which would render any representations or warranties contained in Articles 3 or 4 of this Agreement inaccurate as of the Closing Date and shall promptly notify the other party upon the happening of any event or taking of any action which renders any such representation or warranty inaccurate. Each party shall promptly notify the other of any action, suit or proceeding that shall be instituted or threatened against such party to restrain, prohibit, or otherwise challenge the legality of any transaction contemplated by this Agreement.

### 5.20    Restrictions on Transfer of Osage Stock.

Buyer agrees not to sell, transfer or otherwise dispose of the Osage Stock (including private sales or sales under Rule 144) until the effective date of the "Registration Statement" (as defined in Section 1(f) of the Registration Rights Agreement).

## ARTICLE VI
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligations of Buyer hereunder shall be subject to the following conditions, any or all of which may be waived in writing by Buyer:

6.1     Accuracy of Representations and Warranties; Shareholder Performance.

Each of the representations and warranties of the Shareholder contained herein shall be true and correct in all respects on and as of the Closing Date with the same effect as though made on and as of such date and the Shareholder shall have performed and complied in all respects with each of the agreements, covenants, stipulations, terms and conditions contained herein and required to be performed or complied with by it on or prior to the Closing Date.

6.2     No Adverse Change.

Since the date of the Interim Financial Statements, there shall have been no adverse change in the financial condition, assets or liabilities of the Company.

6.3     No Loss.

Since the date of the Interim Financial Statements, the Company shall not have suffered any loss on account of fire, flood, accident, strike or other calamity which has had or is likely to have an adverse effect on the financial condition or any assets of the Company, whether or not such loss shall have been covered by insurance.

6.4     No Injunction; Consents.

No action, proceeding or investigation shall have been instituted or threatened to set aside the transactions provided for herein or to enjoin or prevent the consummation of the transactions contemplated hereby and all required consents and approvals for the consummation of the transactions contemplated hereby shall have been secured.

6.5     Deliveries by the Shareholder.

The Shareholder shall have executed and delivered to Buyer at Closing, those Exhibits and other documents identified in Section 2.2 hereof.

6.6     Uniform Commercial Code Searches.

Uniform Commercial Code searches (which searches shall be made or caused to be made by and at the expense of Buyer) of filings made pursuant to Article 9 thereof in all jurisdictions where any assets of the Company are located, in form, scope and substance reasonably satisfactory to Buyer and its counsel, shall not disclose any liens, claims, security interests or encumbrances against any of such assets disclosed thereby except liens, claims, security interests

or encumbrances that are disclosed in Financial Statements, this Agreement, or are otherwise released or terminated by the Company prior to or at the time of Closing.

## ARTICLE VII
## CONDITIONS TO THE OBLIGATIONS OF THE SHAREHOLDER

The obligations of the Shareholder shall be subject to the following conditions, any or all of which may be waived in writing by the Shareholder:

7.1    Accuracy of Representations and Warranties; Buyer Performance.

Each of the representations and warranties of Buyer set forth in Article 4 hereof shall be true and correct in all respects on and as of the Closing Date with the same effect as though made on and as of such date and Buyer shall have in all respects performed and complied with each of the agreements, covenants, stipulations, terms and conditions contained herein and required to be performed or complied with by Buyer on or prior to the Closing Date.

7.2    No Adverse Change.

Since the date of the most recent Buyer's SEC Report there shall have been no adverse change in the financial condition, assets or liabilities of the Buyer.

7.3    No Loss.

Since the date of the most recent Buyer's SEC Report, the Buyer shall not have suffered any loss on account of fire, flood, accident, strike or other calamity which has had or is likely to have an adverse effect on the financial condition or any assets of the Buyer, whether or not such loss shall have been covered by insurance.

7.4    No Injunction; Consents.

No action, proceeding or investigation shall have been instituted or threatened to set aside the transactions provided for herein or to enjoin or prevent the consummation of the transactions contemplated hereby and all required consents and approvals for the consummation of the transactions shall have been secured.

7.5    Deliveries by Buyer.

Buyer shall have executed and delivered to the Shareholder those Exhibits and other documents identified in Section 2.2 hereof.

7.6    Consents and Proceedings.

The Buyer shall have obtained all of the consents, authorizations, orders or approvals required in order to execute and deliver this Agreement and to perform its obligations hereunder and thereunder and all actions, proceedings, instruments and documents deemed necessary or

appropriate by Shareholder and its counsel to effectuate this Agreement and the consummation of the transactions contemplated hereby, or incidental thereto, shall have been obtained and all other related legal matters shall have been approved by such counsel.

## ARTICLE VIII
## TERMINATION

8.1    Termination Events

This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by either Buyer or Shareholder if a material breach of any provision of this Agreement has been committed by the other party and such breach has not been waived;

(b)    by Buyer if any of the conditions in Article 6 have not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement), and Buyer has not waived such condition on or before the Closing Date; or (ii) by Shareholder, if any of the conditions in Article 7 have not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Shareholder to comply with his obligations under this Agreement), and Shareholder has not waived such condition on or before the Closing Date;

(c)    by mutual consent of Buyer and Shareholder; or

(d)    by either Buyer or Shareholder if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before the Termination Date, or such later date as the parties may agree upon.

8.2    Effect of Termination

Each party's right of termination under Section 8.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 8.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 10.11, and 5.2 and 5.8 will survive; provided, however, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

8.3    Extension; Waiver.

Any time prior to the Closing, the parties may (a) extend the time for the performance of any of the obligations or other acts of any other party under or relating to this Agreement; (b) waive any inaccuracies in the representations or warranties by any other party or (c) waive compliance with any of the agreements of any other party or with any conditions to its own obligations. Any agreement on the part of any other party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

## ARTICLE IX
## INDEMNIFICATION/SURVIVAL OF REPRESENTATIONS AND WARRANTIES

9.1    Indemnification.

(a)    The Shareholder shall indemnify, defend and hold harmless Buyer from and against any and all demands, claims, actions or causes of action, judgments, assessments, losses, liabilities, damages or penalties and reasonable attorneys' fees and related disbursements (collectively, "Claims") incurred by Buyer which arise out of or result from a misrepresentation, breach of warranty, or breach of any covenant or agreement of the Shareholder contained herein or in the Schedules annexed hereto or in any deed, exhibit, closing certificate, schedule or any ancillary certificates or other documents or instruments furnished by the Shareholder pursuant hereto or in connection with the transactions contemplated hereby or thereby.

(b)    Buyer shall indemnify, defend and hold harmless the Shareholder from and against any and all Claims, as defined at subsection 9.1(a) above, incurred by the Shareholder which arise out of or result from a misrepresentation, breach of warranty or breach of any covenant of Buyer contained herein or in the Schedules annexed hereto or in any deed, exhibit, closing certificate, schedule or any ancillary certificates or other documents or instruments furnished by Buyer pursuant hereto or in connection with the transactions contemplated hereby or thereby.

(c)    The right to indemnification, payment of damages or other remedy based on any representations, warranties, covenants and obligations contained within this Agreement will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of damages, or other remedy based on such representations, warranties, covenants and obligations.

9.2    Survival.

(a)    All representations and warranties contained in or made pursuant to this Agreement or in any agreement, certificate, document or statement delivered pursuant hereto shall

survive the Closing for a period of two (2) years from the Closing Date, unless otherwise specified in such agreement, certificate or document; provided, however, that notwithstanding the foregoing, (i) the representations and warranties set forth in Section 3.33 (relating to environmental matters) and 3.12 (relating to taxes) and all covenants and agreements of the parties relating to the subject matter(s) thereof shall survive the Closing for the period equal to the statute of limitations applicable to Claims arising under such subject matters.

9.3    Methods of Asserting Claims for Indemnification.

All claims for indemnification under this Agreement shall be asserted as follows:

(a)    Third Party Claims. In the event that any Claim for which a party (the "Indemnitee") would be entitled to indemnification under this Agreement is asserted against or sought to be collected from the Indemnitee by a third party the Indemnitee shall promptly notify the other party (the "Indemnitor") of such Claim, specifying the nature thereof, the applicable provision in this Agreement or other instrument under which the Claim arises, and the amount or the estimated amount thereof (the "Claim Notice"). The Indemnitor shall have thirty (30) days (or, if shorter, a period to a date not less than ten (10) days prior to when a responsive pleading or other document is required to be filed but in no event less than ten (10) days from delivery or mailing of the Claim Notice) (the "Notice Period") to notify the Indemnitee (a) whether or not it disputes the Claim and (b) if liability hereunder is not disputed, whether or not it desires to defend the Indemnitee. If the Indemnitor elects to defend by appropriate proceedings, such proceedings shall be promptly settled or prosecuted to a final conclusion in such a manner as to avoid any risk of damage to the Indemnitee; and all costs and expenses of such proceedings and the amount of any judgment shall be paid by the Indemnitor.

If the Indemnitee desires to participate in, but not control, any such defense or settlement, it may do so at its sole cost and expense. If the Indemnitor has disputed the Claim, as provided above, and shall not defend such Claim, the Indemnitee shall have the right to control the defense or settlement of such Claim, in its sole discretion, and shall be reimbursed by the Indemnitor for its reasonable costs and expenses of such defense. Neither Indemnitee nor Indemnitor shall be liable for any settlement of any Claim without the prior written consent of the other party.

(b)    Non-Third Party Claims. In the event that the Indemnitee should have a Claim for indemnification hereunder which does not involve a Claim being asserted against it or sought to be collected by a third party, the Indemnitee shall promptly send a Claim Notice with respect to such Claim to the Indemnitor. If the Indemnitor does not notify the Indemnitee in writing within thirty (30) days of the date of the Claim Notice, then such Claim shall be submitted to arbitration pursuant to Section 10.8 hereof. If the Indemnitor disputes the amount of such Claim, the controversy in question shall be submitted to arbitration pursuant to Section 9.8 hereafter.

(c)    Right of Set-Off. Subject to the terms of the Escrow Agreement, in the event a Claim arises pursuant to subparagraph 9.1(a), in addition to any of its other rights under this paragraph 9, Buyer shall have the right to apply the amount of the Claim which is agreed to

by the other party against the amounts identified at subparagraph 1.4; provided, however, that this subparagraph shall not be the exclusive remedy of Buyer in the event a Claim arises pursuant to subparagraph 9.1(a).

9.4    Limitations on Amount.

(a)    Notwithstanding the provisions of this Article 9, the Indemnitor shall not be required to indemnify the Indemnitee with respect to Claims (other than Claims relating to tax matters and environmental matters and all costs of defense for any such Claim), until the aggregate amount of such Claims shall exceed $20,000 (the "Indemnitor's Floor"); provided, however, if such Claims in the aggregate exceed the amount of the Indemnitor's Floor, the Indemnitor shall indemnify Indemnitee for all Claims irrespective of the Indemnitor's Floor. The Indemnitor's Floor shall not be applicable for Claims as they relate to tax matters and environmental matters and all costs of defense for any such Claims.

(b)    Notwithstanding the provisions of this Article 9, the Buyer's liability with respect to matters set forth in subsection 9.1(b) above for damages shall be limited to the sum of One Million Dollars ($1,000,000). The Shareholder's liability with respect to matters set forth in subsection 9.1(a) shall also be limited to One Million Dollars ($1,000,000), except for damages arising out of a breach of the representations and warranties at Sections 3.1 to 3.6 inclusive, Sections 3.12 and 3.32, and any and all fraudulent actions and statements or intentional misrepresentations, in which case the maximum liability of the Shareholder shall be limited to the Purchase Price.

## ARTICLE X
## MISCELLANEOUS

10.1    Exclusive Remedies.

The right to indemnification under Article IX of the Agreement shall be the exclusive remedy for a breach of a representation, warranty, covenant or other provision of this Agreement except that Buyer and the Shareholder shall have the right to obtain injunctive relief to restrain any breach or otherwise to specifically enforce the provisions of this Agreement, it being agreed by the parties that money damages alone would be inadequate to compensate Buyer or the Shareholder, as the case may be, for such breach or other failure to perform the obligations under this Agreement.

10.2    Notices.

All notices requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given on the date if delivered personally, or upon the second business day after it shall have been deposited by certified or registered mail with postage prepaid, or sent by telex, telegram or telecopier, as follows (or at such other address or facsimile number for a party as shall be specified by like notice):

if to the Shareholder:

Mr. O. Jack Anderson
1560 S.E. 14th Court
Deerfield Beach, FL  33441

Telephone:  (954) 429-3016

with a copy to:

Joseph M. Rigot, Esquire
Thompson Hine & Flory LLP
2000 Courthouse Plaza, NE
Dayton, OH  45401-8801

Fax: (937) 443-6635

and

if to Buyer, to it at:

Mr. Jack Leadbeater, Chief Executive Officer
Osage Systems Group, Inc.
1661 E. Camelback Road, Suite 245
Phoenix, AZ  85016

Fax: (602) 274-1295

with a copy to:

Stephen M. Cohen, Esquire
Buchanan Ingersoll, P.C.
Eleven Penn Center, 14th Floor
Philadelphia, PA  19103

Fax: (215) 665-8760

10.3   Entire Agreement; Assignment.

This Agreement, including all Exhibits and Schedules hereto, constitutes the entire Agreement among the parties with respect to its subject matter and supersedes all prior agreements and understandings, both written and oral, among the parties or any of them with respect to such subject matter and shall not be assigned by operation of law or otherwise.

10.4   Binding Effect; Benefit.

This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns. Nothing in this Agreement is intended to confer on any person other than the parties to this Agreement or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

10.5   Headings.

The descriptive headings of the sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

10.6   Counterparts.

This Agreement may be executed in two or more counterparts and delivered via facsimile, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument.

10.7   Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

10.8   Arbitration.

If a dispute arises as to the interpretation of this Agreement, it shall be decided finally in an arbitration proceeding conforming to the Rules of the American Arbitration Association applicable to commercial arbitration then in effect at the time of the dispute. The arbitration shall take place in Broward County, Florida. The decision of the Arbitrators shall be conclusively binding upon the parties and final, and such decision shall be enforceable as a judgment in any court of competent jurisdiction. The parties shall share equally the costs of the arbitration.

10.9   Severability.

If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its

-40-

regulatory policy, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

10.10   Release and Discharge.

By virtue of his execution of this Agreement, as of the Closing and thereafter, the Shareholder hereby agrees to release, remise and forever discharge the Company from and against any and all debts, obligations, liabilities and amounts owing from the Company to the Shareholder prior to the Closing, and the Company is not obligated to take any action or make any payments to third parties on behalf of the Shareholder.

10.11   Expenses.

Except as set forth in this Article 10, the Shareholder shall pay all fees and expenses incurred by him and the Company in connection with the transactions provided for hereunder, including the fees and expenses of Shareholder's counsel and accountants; and Buyer shall pay all expenses incurred by it in connection with the transactions provided for hereunder, including the fees and expenses of its counsel and accountants.

10.12   Amendment and Modification.

This Agreement may be amended, by written agreement of Buyer and the Shareholder. This Agreement may not be amended except by an instrument in writing signed on behalf of Buyer and the Shareholder.

IN WITNESS WHEREOF, each of the parties has executed or caused this Agreement to be executed as of the date first above written.

ATTEST:                                              OSAGE SYSTEMS GROUP, INC.

_____                  By: _____
Secretary                                                    Jack Leadbeater,
                                                                  Chief Executive Officer


WITNESS:                                             SHAREHOLDER

_____                  _____
                                                                  O. Jack Anderson,

-42-



COMMON STOCK

SEE REVERSE FOR
CERTAIN DEFINITIONS

CUSIP 687735 10 0

COMMON STOCK

INCORPORATED UNDER THE LAWS
OF THE STATE OF DELAWARE

# OSAGE SYSTEMS GROUP, INC.

COUNTERSIGNED AND REGISTERED

**CONTINENTAL STOCK TRANSFER & TRUST COMPANY**
(JERSEY CITY NEW JERSEY)

TRANSFER AGENT
AND REGISTRAR

BY

AUTHORIZED OFFICER

# CERTIFICATE OF STOCK

SEE LEGEND ON REVERSE SIDE

THIS CERTIFIES that

O. JACK ANDERSON

is the owner of **ONE HUNDRED SIXTY SIX THOUSAND SIX HUNDRED SIXTY SEVEN**

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK, PAR VALUE $.01 PER SHARE, OF

OSAGE SYSTEMS GROUP, INC.

transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon
surrender of this certificate properly endorsed.

This certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

WITNESS the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:

CHIEF EXECUTIVE OFFICER

SECRETARY

OSAGE SYSTEMS GROUP, INC.
CORPORATE
SEAL
1992
DELAWARE

EXHIBIT "B"

The Corporation will furnish without charge to each stockholder who so requests a statement of the powers, designations, preferences and relative, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| TEN COM | – as tenants in common | UNIF GIFT MIN ACT–....................Custodian.................. |
| TEN ENT | – as tenants by the entireties | (Cust)                      (Minor) |
| JT TEN | – as joint tenants with right of survivorship and not as tenants in common | under Uniform Gifts to Minors Act....................... (State) |

Additional abbreviations may also be used though not in the above list.

*For value received,* ____–_____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE)

_____

_____

_____ *shares*

*of the capital stock represented by the within Certificate, and do hereby irrevocably constitute and appoint*

_____ *Attorney*

*to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* _____

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF REGISTRATION, OR THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION, UNDER THE SECURITIES ACT OF 1933, AS AMENDED.
LEG P025B

THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATIONS AND CREDIT UNIONS WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM), PURSUANT TO S.E.C. RULE 17Ad-15.

COMMON STOCK
SEE REVERSE FOR
CERTAIN DEFINITIONS

CUSIP 687735 10 0

# OSAGE SYSTEMS GROUP, INC.

COMMON STOCK
INCORPORATED UNDER THE LAWS
OF THE STATE OF DELAWARE

THIS CERTIFIES that

O. JACK ANDERSON

is the owner of

**ONE HUNDRED SIXTY SIX THOUSAND SIX HUNDRED SIXTY SEVEN**

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK, PAR VALUE $.01 PER SHARE, OF

OSAGE SYSTEMS GROUP, INC.

transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed. This certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar.

WITNESS the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:

# CERTIFICATE OF STOCK

COUNTERSIGNED AND REGISTERED
CONTINENTAL STOCK TRANSFER & TRUST COMPANY
(JERSEY CITY NEW JERSEY)
TRANSFER AGENT
AND REGISTRAR

BY

AUTHORIZED OFFICER

CHIEF EXECUTIVE OFFICER

SECRETARY

OSAGE SYSTEMS GROUP, INC.
CORPORATE SEAL 1992 DELAWARE





The Corporation will furnish without charge to each stockholder who so requests a statement of the powers, designations, preferences and relative, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | – as tenants in common | UNIF GIFT MIN ACT–......................Custodian...................... |
| TEN ENT | – as tenants by the entireties | (Cust) (Minor) |
| JT TEN | – as joint tenants with right of<br>survivorship and not as tenants<br>in common | under Uniform Gifts to Minors<br>Act........................<br>(State) |

Additional abbreviations may also be used though not in the above list.

*For value received,* _____ – _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

_____
(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE)

_____

_____

_____ *shares*

*of the capital stock represented by the within Certificate, and do hereby irrevocably constitute and appoint*

_____ *Attorney*

*to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* _____

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF REGISTRATION, OR THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION, UNDER THE SECURITIES ACT OF 1933, AS AMENDED.
LEG P025B

Signature(s) Guaranteed:

THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATIONS AND CREDIT UNIONS WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM), PURSUANT TO S.E.C. RULE 17Ad-15.

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (the "Agreement") is dated as of April 24, 1998 by and between Osage Systems Group, Inc., a Delaware corporation (the "Company") and O. Jack Anderson (the "Holder"), the sole shareholder of Open System Technologies, Inc., a Delaware corporation ("OST").

### W I T N E S E T H:

WHEREAS, the Company and the Holder are parties to a stock purchase agreement dated as of April 24, 1998 (the "Stock Purchase Agreement") pursuant to which the Company will acquire all of the issued and outstanding shares of the common stock, no par value, of OST;

WHEREAS, pursuant to the Stock Purchase Agreement, the Holder is to receive certain shares of the Company's $.01 par value common stock (the "Common Stock"); and

WHEREAS, the parties hereto desire to set forth their agreement concerning the registration under the Securities Act of 1933, as amended, of the Common Stock issued to the Holder pursuant to the Stock Purchase Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

### AGREEMENT

1.    Definitions.

    (a)    "Closing" shall mean that date upon which a closing of the Stock Purchase Agreement occurs.

    (b)    "Company" shall mean Osage Systems Group, Inc.

    (c)    "Exchange Act" shall mean the Securities Exchange Act of 1934.

    (d)    "Holder" shall mean O. Jack Anderson, the former shareholder of OST, who has received, or may receive subsequent to the date hereof, shares of the Company's Common Stock pursuant to the Stock Purchase Agreement.

    (e)    "Person" means an individual, a partnership (general or limited), corporation, limited liability company, joint venture, business trust, cooperative, association or other form of business organization, whether or not regarded as a legal entity under applicable law, a trust (inter vivos or testamentary), an estate of a deceased, insane or incompetent person, a quasi-governmental entity, a government or any agency, authority, political subdivision or other instrumentality thereof, or any other entity.

    (f)    "Registration Statement" shall mean the Registration Statement of the Company filed with the SEC pursuant to the provisions of Section 2 of this Agreement which covers the resale of the Restricted Stock on an appropriate form then permitted by the SEC to be

EXHIBIT "C"

used for such registration and the sales contemplated to be made thereby under the Securities Act, and all amendments and supplements to such Registration Statement, including any pre-and post-effective amendments thereto, in each case including the prospectus contained therein, all exhibits thereto and all materials incorporated by reference therein.

(g)    "Restricted Stock" shall mean all or any shares of Common Stock or other equity securities of the Company that may be issued to the Holder pursuant to subparagraph 1.2(b) of the Stock Purchase Agreement, and any additional shares of Common Stock or other equity securities of the Company issued or issuable after the date hereof in respect of any such securities (or other equity securities issued in respect thereof) by way of a stock dividend or stock split, in connection with a combination, exchange, reorganization, recapitalization or reclassification of Company securities, or pursuant to a merger, division, consolidation or other similar business transaction or combination involving the Company; provided that:  as to any particular shares of Restricted Stock, such securities shall cease to constitute Restricted Stock (i) when a registration statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of thereunder; or (ii) when and to the extent such securities are permitted to be distributed pursuant to Rule 144 (or any successor provision to such Rule) under the Securities Act; or (iii) when such securities are otherwise freely transferable to the public without further registration under the Securities Act.

(i)    "Securities Act" shall mean the Securities Act of 1933, as amended, or any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at any relevant time.

(j)    "SEC" shall mean the United States Securities and Exchange Commission.

(k)    "Trading Day" shall mean any day on which the New York Stock Exchange is open for trading.

Capitalized terms used in this Agreement and not otherwise defined herein shall have the same meaning ascribed to them in the Stock Purchase Agreement.

2.    Shelf Registration.

(a)    The Company shall use it best efforts to prepare and file, not later than May 25, 1999 , a Registration Statement with the SEC and use its best efforts to, as promptly as possible have such Registration Statement declared effective for the purpose of facilitating the public resale of the Restricted Stock.

(b)    Notwithstanding anything to the contrary contained herein, the Company's obligation in subparagraph 2(a) above shall extend only to the inclusion of the Restricted Stock in a Registration Statement filed under the Securities Act.  The Company shall have no obligation to assure the terms and conditions of distribution, to obtain a commitment from an underwriter relative to the sale of the Restricted Stock or to otherwise assume any responsibility for the manner, price or terms of the distribution of the Restricted Stock.  Furthermore, the Company shall not be restricted in any manner from including within the Registration Statement the

2

distribution, issuance or resale of any of its or any other securities, unless there is a reasonable probability in the opinion of counsel experienced in such matters governed by the Securities Act, that the inclusion of securities other than Restricted Stock would materially delay the effectiveness of the Registration Statement.

(c)    If at the time the Company is obligated to file a Registration Statement hereunder, it has commenced the preparation of a registration statement or has otherwise secured a commitment from a managing underwriter in connection with an underwritten primary offering to be undertaken by the Company (the "Primary Offering"), and the managing underwriter of such Primary Offering advises the Company that the public resale of the Restricted Stock would be likely to have a material adverse effect on the consummation of the Primary Offering, then and in that event, the Company may delay the filing of the Registration Statement with the SEC until ninety (90) days after the completion of the Primary Offering, and the Holder agrees not to sell, transfer or otherwise dispose of the Restricted Stock (including private sales or sales under Rule 144) until the effective date of the Registration Statement.

3.    Registration Procedures. Whenever it is obligated to register any Restricted Stock pursuant to this Agreement, the Company shall:

(a)    prepare and file with the Commission a Registration Statement with respect to the Restricted Stock in the manner set forth at Section 2 hereof and use its best efforts to cause such Registration Statement to become effective as promptly as possible and to remain effective for that period identified in subparagraph 3(g) hereafter;

(b)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the period specified in subparagraph 3(g) below and to comply with the provisions of the Securities Act with respect to the disposition of all Restricted Stock covered by such Registration Statement in accordance with the Holder's intended method of disposition set forth in such Registration Statement for such period;

(c)    furnish to the Holder and to each underwriter, if any, such number of copies of the Registration Statement and the prospectus included therein (including each preliminary prospectus), as such persons may reasonably request in order to facilitate the public sale or other disposition of the Restricted Stock covered by such Registration Statement;

(d)    use its best efforts to register or qualify the Restricted Stock covered by such Registration Statement under the securities or blue sky laws of such jurisdictions as the Holder, or, in the case of an underwritten public offering, the managing underwriter shall reasonably request; provided, however, that the Company shall not for any such purpose be required to qualify generally to transact business as a foreign corporation in any jurisdiction where it is not so qualified or to consent to general service of process in any such jurisdiction;

(e)    immediately notify the Holder under such Registration Statement and each underwriter, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus contained in such

Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required or necessary to be stated therein in order to make the statements contained therein not misleading in light of the circumstances under which they were made;

(f)     make available for inspection by the Holder, any underwriter participating in any disposition pursuant to such Registration Statement, and any attorney, accountant or other agent retained by the Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors and employees to supply all information reasonably requested by the Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(g)     for purposes of subparagraphs 3(a) and 3(b) above, the period of distribution of Restricted Stock shall be deemed to extend until the earlier of: (A) in an underwritten public offering of all of the Restricted Stock, the period in which each underwriter has completed the distribution of all securities purchased by it; (B) in any other registration, the period in which all shares of Restricted Stock covered thereby shall have been sold; and (C) a period of two (2) years from the effective date of the Registration Statement filed by the Company with the SEC pursuant to this Agreement.

(h)     if the Common Stock is listed on any securities exchange or automated quotation system, the Company shall use its best efforts to list (with the listing application being made at the time of the filing of such Registration Statement or as soon thereafter as is reasonably practicable) the Restricted Stock covered by such Registration Statement on such exchange or automated quotation system;

(i)     enter into normal and customary underwriting arrangements or an underwriting agreement and take all other reasonable and customary actions if the Holder sells his shares of Restricted Stock pursuant to an underwriting (however, in no event shall the Company, in connection with such underwriting, be required to undertake any special audit of a fiscal period in which an audit is normally not required);

(j)     notify the Holder if there are any amendments to the Registration Statement, any requests by the SEC to supplement or amend the Registration Statement, or of any threat by the SEC or state securities commission to undertake a stop order with respect to sales under the Registration Statement; and

(k)     cooperate in the timely removal of any restrictive legends from the shares of Restricted Stock in connection with the resale of such shares covered by an effective Registration Statement.

4.     Expenses.

(a)     For the purposes of this Section (4), the term "Registration Expenses" shall mean: all expenses incurred by the Company in complying with Section (2) of this Agreement, including, without limitation, all registration and filing fees, printing expenses, fees

and disbursements of counsel and independent public accountants for the Company, "blue sky" fees, fees of the National Association of Securities Dealers, Inc. ("NASD"), fees and expenses of listing shares of Restricted Stock on any securities exchange or automated quotation system on which the Company's shares are listed and fees of transfer agents and registrars. The term "Selling Expenses" shall mean: all underwriting discounts and selling commissions applicable to the sale of Restricted Stock and all accountable or non-accountable expenses paid to any underwriter in respect of the sale of Restricted Stock.

       (b)    Except as otherwise provided herein, the Company will pay all Registration Expenses in connection with the Registration Statement filed pursuant to Section (2) of this Agreement. All Selling Expenses in connection with any Registration Statement filed pursuant to Section (2) of this Agreement shall be borne by the Holder unless the sale of other securities is covered by such Registration Statement, in which event the Selling Expenses shall be borne by the Holder in proportion to the number of shares sold by him or by such persons other than the Company (except to the extent the Company may be a seller) as they may agree.

     5.    Obligations of the Holder.

       (a)    In connection with the registration hereunder, the Holder will furnish to the Company in writing such information with respect to Holder and the securities held by Holder, and the proposed distribution by him as shall be reasonably requested by the Company in order to assure compliance with federal and applicable state securities laws, as a condition precedent to including the Holder's Restricted Stock in the Registration Statement. The Holder also shall agree to promptly notify the Company of any changes in such information included in the Registration Statement or prospectus as a result of which there is an untrue statement of material fact or an omission to state any material fact required or necessary to be stated therein in order to make the statements contained therein not misleading in light of the circumstances then existing.

       (b)    In connection with the registration pursuant to this Agreement, the Holder will not effect sales thereof pursuant to the Registration Statement until notified by the Company of the effectiveness of the Registration Statement, and thereafter will suspend such sales after receipt of telegraphic or written notice from the Company to suspend sales to permit the Company to correct or update a Registration Statement or prospectus. At the end of any period during which the Company is obligated to keep a Registration Statement current, the Holder shall discontinue sales of shares pursuant to such Registration Statement upon receipt of notice from (i) the Company of its intention to remove from registration the shares covered by such Registration Statement which remain unsold, and the Holder shall notify the Company of the number of shares registered which remain unsold immediately upon receipt of such notice from the Company.

     6.    Information Blackout.

       At any time when a Registration Statement effected pursuant to Section 2 relating to Restricted Stock is effective, upon written notice from the Company to the Holder that the Company has determined in good faith that sale of Restricted Stock pursuant to the Registration Statement would require disclosure of non-public material information, the Holder shall suspend sales of Restricted Stock pursuant to such Registration Statement until such time as the Company

notifies the Holder that such material information has been disclosed to the public or has ceased to be material or that sales pursuant to such Registration Statement may otherwise be resumed.

7.  Indemnification.

(a)  The Company agrees to indemnify, to the extent permitted by law, the Holder against all losses, claims, damages, liabilities and expenses joint or several, to which an indemnified person may become subject under the Securities Act or any other statute or at common law, insofar as such liability (or action in respect thereof) arises out of or is based upon (a) any alleged untrue statement of material fact contained in any Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or (b) any alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of the Securities Act or state securities or other blue sky laws applicable to the Company in connection with such registration, except insofar as the same are caused by or contained in any information furnished to the Company by the Holder for use therein or by such Holder's failure to deliver a copy of the Registration Statement or prospectus or any amendments or supplements thereto after the Company has furnished the Holder with a sufficient number of copies of the same.

(b)  In connection with any Registration Statement in which a Holder is participating, the Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and each Person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses resulting from: (i) any untrue statement of material fact contained in the Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished by such Holder; and (ii) any manner of sale or distribution of the Restricted Stock by the Holder not in compliance with the method of distribution permitted in the Registration Statement or otherwise in violation of applicable securities laws; provided that the obligation to indemnify shall be limited to the net amount of proceeds received by the Holder from the sale of Restricted Stock pursuant to such Registration Statement.

(c)  Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than

one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim.

(d)    The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and shall survive the transfer of securities.  The Company also agrees to make such provisions, as are reasonably requested by any indemnified party, for contribution to such party in the event the Company's indemnification is unavailable for any reason.

8.    <u>Miscellaneous Provisions</u>.

(a)    <u>Governing Law</u>. -This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

(b)    <u>Counterparts</u>.    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(c)    <u>Amendments and Waivers</u>.    Except as otherwise provided herein, the provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given without the written consent of the Company and the Holder.

(d)    <u>Notices</u>.    All communications under this Agreement shall be sufficiently given if delivered by hand or by overnight courier or mailed by registered or certified mail, postage prepaid, addressed,

(i)    if to the Company, to:

Mr. Jack Leadbeater
Chief Executive Officer
Osage Systems Group, Inc.
1661 Camelback Road, Suite 245
Phoenix, Arizona 85016
Telephone Number: (602) 241-5782
Telecopy Number: (602) 274-1295

with a copy to:

Stephen M. Cohen, Esquire
Buchanan Ingersoll, P.C.
Eleven Penn Center
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Telephone Number: (215) 665-3873
Telecopy Number: (215) 665-8760

    (ii)    if to the Holder:

Mr. O. Jack Anderson
1560 S.E. 14th Court
Deerfield Beach, FL 33441
Telephone Number: (954) 429-3016

with a copy to:

Joseph M. Rigot, Esquire
Thompson Hine & Flory LLP
2000 Courthouse Plaza, N.E.
Dayton, OH 45401-8801
Telephone Number: (937) 443-6586
Telecopy Number: (937) 443-6635

or, at such other address as any of the parties shall have furnished in writing to the other parties hereto.

    (e)    <u>Successors and Assigns; Holders as Beneficiaries</u>.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns, and the agreements of the Company herein shall inure to the benefit of the Holder and his respective successors and assigns.

    (f)    <u>Headings</u>.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

    (g)    <u>Entire Agreement; Survival; Termination</u>.  This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

ATTEST:

By: _____

OSAGE SYSTEMS GROUP, INC.

By: _____
Name: _____
Title: _____

_____
O. Jack Anderson

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**

OHMER JACK ANDERSON    00-6071

**DEFENDANTS**

OSAGE SYSTEMS GROUP, INC.

CIV-ZLOCH    **MAGISTRATE JUDGE SELTZER**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

at 1 - 0.00-6071- Zloch Mag Selt

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER) 954-462-7806
Jeffrey B. Smith, 1401 E. Broward Blvd.
#206, Ft. Lauderdale, FL 33301

ATTORNEYS (IF KNOWN) William E. Davis, Buchanan Ingersoll
2100 NationsBank Tower, 100 S.E. 2nd St. Miami,
FL 33131  (305) 347-4080

**d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, (BROWARD,) PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | B☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault Libel & Slander | | B☐ 630 Liquor Laws | | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 640 R.R. & Truck | A PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | | B☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 340 Marine | PERSONAL PROPERTY | B☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | A LABOR | B SOCIAL SECURITY | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | | B☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | B☐ 540 Mandamus & Other | | A☐ 871 IRS – Third Party 26 USC 7609 | A OR B |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | B☐ 550 Civil Rights | A☐ 791 Empl Ret Inc Security Act | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is an action for breach of contract between a citizen of Florida and a corporation incorporated in Delaware with its principal place of business located in Phoenix, AZ, alleging damages in the amount of $2,000,000. This case
LENGTH OF TRIAL via 2 — 3 days estimated for both sides to try entire case) was removed under Title USC Sections 1446 and 1332 (1999).

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $2,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) (See instructions): IF ANY

JUDGE _____    DOCKET NUMBER _____

DATE January 14, 2000

SIGNATURE OF ATTORNEY OF RECORD

WILLIAM E. DAVIS Fla. Bar No.: 191680

**FOR OFFICE USE ONLY**

RECEIPT #  518306    AMOUNT $150.00    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

01-14-00